NUMBERS 13-07-00301-CV
 


COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


CENTOCOR, INC. Appellant,


v.


PATRICIA HAMILTON,

THOMAS HAMILTON, AND 

MICHAEL G. BULLEN, M.D., Appellees.

 





On appeal from County Court at Law No. 4

of Nueces County, Texas.

 


O P I N I O N



Before Justices Yañez, Rodriguez, and Vela


Opinion by Justice Yañez
 

 

 Our medical-legal jurisprudence is based on images of health care
that no longer exist. At an earlier time, medical advice was received in the
doctor's office from a physician who most likely made house calls if needed. 
The patient usually paid a small sum of money to the doctor. Neighborhood
pharmacists compounded prescribed medicines. Without being pejorative,
it is safe to say that the prevailing attitude of law and medicine was that the
"doctor knows best." 


 Pharmaceutical manufacturers never advertised their products to
patients, but rather directed all sales efforts at physicians. In this comforting
setting, the law created an exception to the traditional duty of manufacturers
to warn consumers directly of risks associated with the product as long as
they warned health-care providers of those risks. 


 For good or ill, that has all changed. Medical services are in large
measure provided by managed care organizations. Medicines are
purchased in the pharmacy department of supermarkets and often paid for
by third-party providers. Drug manufacturers now directly advertise products
to consumers on the radio, television, the Internet, billboards on public
transportation, and in magazines.


Perez v. Wyeth Labs., 734 A.2d 1245, 1246-47 (N.J. 1999) (citation omitted).


 Against this backdrop, we are called upon to decide whether a drug manufacturer
can rely on its adequate warnings to physicians to satisfy its duty to warn the ultimate
consumer, the patient, when it directly advertises to the patient in a misleading fashion. 
We hold it cannot.

 Patricia and Thomas Hamilton sued Centocor, Inc. and others after Patricia suffered
from a drug-induced lupus-like syndrome allegedly caused by her use of Remicade, a drug
Centocor manufactured. Patricia was shown a video that she alleged over-emphasized
the benefits of Remicade but intentionally omitted warnings about the adverse side-effects
she suffered. A jury found in favor of the Hamiltons on all issues presented. The trial court
entered judgment on the jury's verdict in Patricia's favor for $4,687,461.70 in actual and
punitive damages, and in Thomas's favor for $120,833.71 in actual and punitive damages,
based on the jury's finding of fraud. By numerous issues, Centocor argues that (1) the
"learned intermediary" doctrine precludes the Hamiltons' claims because Centocor
adequately warned Patricia's physicians; (2) the Hamiltons failed to present legally and
factually sufficient evidence of causation; (3) the evidence of fraud by omission is legally
and factually insufficient; (4) the Hamiltons cannot maintain a cause of action for implied
misrepresentation, and their implied misrepresentation claims fail individually; (5) the
Hamiltons failed to present expert testimony on the standard of care; (6) there is no cause
of action for negligent misbranding; (7) the distribution of the videotape did not constitute
negligent undertaking; (8) the evidence of future damages is legally and factually
insufficient; (9) Thomas cannot recover on his derivative claims; and (10) the judgment
should be remitted because the trial court misapplied the punitive damages cap. 

 Today we recognize an exception to the learned intermediary doctrine when a drug
manufacturer directly advertises to its consumers in a fraudulent manner. (1) We further hold
that the causation evidence and the evidence of fraud is legally and factually sufficient to
support the judgment. We hold, however, that Patricia did not present sufficient evidence
of future pain and mental anguish damages. Finally, we hold that the trial court properly
applied the punitive damages cap. Accordingly, we reverse the trial court's award of future
pain and mental anguish damages, modify the judgment to reflect this change, and affirm
as modified. 

I. Background


A. Crohn's Disease and Remicade


 According to Patricia's gastroenterologist, Ronald Hauptman, M.D., Crohn's disease
is an autoimmune disease that causes a chronic inflammation of the intestines. It can
involve any part of the gastrointestinal tract from the mouth to the anus, but it primarily
involves the distal small bowel and the colon. Crohn's disease begins with a "flare" of
inflammation that causes serious pain in the intestines, which typically increases in severity
and duration. 

 There is currently no "cure" for Crohn's disease; however, there are several
treatment options. Dr. Hauptman testified that the treatment for a patient's Crohn's
disease depends on the severity of the disease both before and at the time of treatment. 
The goal of treatment is to control the intestinal inflammation. 

 In recent medical history, steroids were the first drugs used to treat Crohn's disease. 
For example, during a "flare" of the disease, prednisone is a steroid treatment that can be
used to reduce inflammation. As technology advanced, drugs called "5-ASA" were
developed, which are anti-inflammatory medications doctors use to maintain remission of
the disease. Later, immunosuppressants were developed in an attempt to address the
immune system problem and suppress the inflammatory component that attacks the bowel. 
Imuran is an immunosuppressant frequently used for this purpose. 

 If left untreated, Crohn's disease can cause the patient to lose the ability to digest
food. A severe flare, without effective treatment, can result in a patient requiring surgery
to remove inflamed portions of the bowel, which is called a "resection." Additionally, a
colostomy can be performed, where the bowel is diverted to exit the abdomen. A
colostomy bag is then attached that permits the patient to pass stools into the bag, which
must be drained by the patient, instead of the normal waste elimination process. 

 Centocor is a subsidiary of Johnson & Johnson, Inc. In November 1998, Centocor
received approval from the federal Food and Drug Administration ("FDA") for the drug
Remicade, which was approved to treat Crohn's disease. Later, Remicade was approved
to treat rheumatoid arthritis. Remicade is an immunosuppressant. It works by binding to
and blocking the harmful effects of tumor necrosis factor ("TNF"), a substance naturally
produced by the body that causes inflammation.

 Centocor called Barbara Matthews, M.D., to testify at trial about the approval
process at the FDA. Dr. Matthews worked for the FDA between 1994 and 2000 and was
the clinical reviewer for Centocor's application for FDA approval of Remicade. According
to Dr. Matthews, when a drug is approved, the drug manufacturer drafts what is called a
"package insert," which contains warnings and other information about the drug. The FDA
reviews the proposed package insert and makes revisions. After the package insert is
approved, it is typically revised over time as new information becomes available. 

 On August 8, 2001, the Remicade package insert warned of lupus-like syndrome
as follows: 

 PRECAUTIONS:

 Autoimmunity

 Treatment with REMICADE may result in the formation of autoantibodies
and, rarely, in the development of a lupus-like syndrome. If a patient
develops symptoms suggestive of a lupus-like syndrome following treatment
with REMICADE, treatment should be discontinued (see ADVERSE
REACTIONS, Autoantibodies/Lupus-like Syndrome).

 

 . . . .

 

 ADVERSE REACTIONS:

 

 . . . .

 

 Autoantibodies/Lupus-like Syndrome

 In the ATTRACT rheumatoid arthritis study through week 54, 49% of
REMICADE-treated patients developed anti-nuclear antibodies (ANA)
between screening and last evaluation, compared to 21% of placebo-treated
patients. Anti-dsDNA antibodies developed in approximately 10% of
REMICADE-treated patients, compared to none of the placebo-treated
patients. No association was seen between REMICADE dose/schedule and
development of ANA or anti-dsDNA.

 

 Of Crohn's disease patients treated with REMICADE who were evaluated for
antinuclear antibodies (ANA), 34% developed ANA between screening and
last evaluation. Anti-dsDNA antibodies developed in approximately 9% of
Crohn's disease patients treated with REMICADE. The development of anti-dsDNA antibodies was not related to either the dose or duration of
REMICADE treatment. However, baseline therapy with an
immunosuppressant in Crohn's disease patients was associated with the
reduced development of anti-dsDNA antibodies (3% compared to 21% in
patients not receiving any immunosuppressant). Crohn's disease patients
were approximately 2 times more likely to develop anti-dsDNA antibodies if
they were ANA positive at study entry.

 

 In clinical studies, three patients developed clinical symptoms consistent with
lupus-like syndrome, two with rheumatoid arthritis and one with Crohn's
disease. All three patients improved following discontinuation of therapy and
appropriate medical treatment. No cases of lupus-like reactions have been
observed in up to three years of long-term follow up (see PRECAUTIONS,
Autoimmunity).


Dr. Matthews explained that if a risk associated with a drug's treatment is included on the
package insert, that risk is reasonably associated with the treatment.

B. Evidence of Centocor's Marketing Strategy


 As of June 2000, Centocor's marketing strategy included a two-pronged approach
that included educating physicians to "refine their definition of the target Remicade patient"
and to teach patients to "demand Remicade." Centocor's goal was to make Remicade "top
of mind" for every rheumatoid arthritis patient. A chart admitted into evidence shows
Centocor's plan for addressing patients, and it states that the goal is to "[m]ake the
consumer aware the [medical] problem is treatable" and to "[e]ncourage the patient to
request a specific drug." 

 Centocor also required its sales associates to sell a specific number of vials of
Remicade to doctors' offices. David Dullnig, Centocor's local Regional Training Manager
for sales, testified that as of August 2002, his goal was to "work on [doctors] being more
aggressive in prescribing Remicade." One of these strategies included encouraging
doctors to provide Remicade infusions in their office to maximize the profits the doctors
could realize from prescribing Remicade. Dr. Hauptman testified that a representative from
Centocor approached him to discuss the economic benefits that could be obtained
because Medicare and Medicaid will pay for Remicade infusions; thus the doctors could
make money from prescribing Remicade and providing the infusions in their offices.

 Centocor also attempted to minimize negative publicity about the potentially
dangerous side effects of Remicade. The Hamiltons called Thomas Schiable, the vice
president of medical affairs for Centocor, who testified about a scientific study scheduled
to be published in the New England Journal of Medicine on February 13, 2003,
demonstrating that problems with Remicade had been understated. Instead of addressing
the substantive safety concerns raised in the article, Centocor's "Communications
Program" recognized that the New England Journal of Medicine "traditionally garners
significant media attention," which includes multiple stories filed by the Associated Press. 
Centocor's stated objectives in responding to the negative article were to: (1) neutralize
the commercial impact of the publication, (2) confine the story to one news cycle, and (3)
provide context to the stories that appear. Furthermore, Centocor planned to
"[d]ecrease/eliminate news value by pre-positioning data as a 'non-story' with key media." 
Dr. Matthews testified that it would be "highly unusual" for a drug company to undertake
a program to dilute the effect of a negative peer review article. 


C. Drug-Induced Lupus-Like Syndrome


 At trial, there were numerous descriptions of "lupus-like syndrome." Dr. Hauptman
and Mary Olsen, M.D., an expert hired by Centocor but called by the Hamiltons, testified
that lupus-like syndrome has characteristics similar to the autoimmune disorder systemic
lupus erysthematosus ("SLE"), but it is caused by a drug. (2) As soon as the offending agent
is removed, the symptoms go away. 

 According to all of the doctors that testified on the subject, diagnosis of lupus-like
syndrome can be difficult. They generally agreed that the symptoms of "lupus-like
syndrome" include weight gain, joint pain and swelling, fatigue, unusual weakness, rash,
oral ulcers, fever, leukopenia, (3) and pericarditis. (4) A patient with Crohn's disease or with
rheumatoid arthritis, another auto-immune disease, could present with similar symptoms,
like joint pain. 

 Laboratory tests can be conducted to check for anti-nuclear antibodies ("ANA") and
double-stranded DNA antibodies ("anti-dsDNA" or "double-stranded DNA antibodies"). 
Adriana Pop-Moody, M.D., testified that the ANA test is "like a screen test" for lupus, but
it is not definitive. According to Atilla Ertan, M.D., the most important test for diagnosing
lupus-like syndrome is the double-stranded DNA antibody test. Dr. Ertan testified that if
a patient tests positive for double-stranded DNA antibodies, the test is suggestive of lupus-like syndrome. Dr. Olsen also testified that a test can be conducted for "antihistone
antibodies," which would also be suggestive of a drug-induced lupus-like syndrome.

 Difficulties arise in diagnosing a patient on Remicade with a positive ANA test and
a positive double-stranded DNA antibody test because patients receiving Remicade may
test positive for these antibodies without having lupus-like syndrome. Thus, Dr. Olsen
explained that to diagnose lupus-like syndrome, a doctor must look at both the laboratory
test results and the clinical presentation of symptoms. According to Dr. Olsen, because
a positive ANA and double-stranded DNA antibody test may be produced by the Remicade
itself, a test that is positive for antihistone antibodies gets her attention and indicates lupus-like syndrome.

D. Patricia's Medical History Prior to 2001


 Patricia has a complicated medical history. At the time of trial, Patricia was forty-seven years old and had suffered from Crohn's disease for most of her life. She was finally
diagnosed in 1977, when she was seventeen years old. Over the course of the disease,
Patricia had undergone multiple surgeries, involving the removal of sections of her bowel,
colon, and rectum; she also had a permanent colostomy. During one of the surgeries,
Patricia contracted hepatitis C from a blood transfusion. Patricia also was diagnosed with
sarcoidosis. (5)

E. Ronald Hauptman, M.D.

 On June 1, 2000, Patricia became a patient of Dr. Hauptman, a gastroenterologist
then practicing in Corpus Christi, for her Crohn's disease. At that time, Patricia was taking
various medications related to her medical conditions, including the immunosuppressant
Imuran. Patricia reported to Dr. Hauptman that she was not taking any 5-ASA medications
because she had an allergic reaction to those type of drugs in the past. In addition to
Crohn's disease, Patricia reported a history of bleeding from a duodenal ulcer, hepatitis C,
gastroesophageal reflux disease, sarcoidosis, and hormonal replacement therapy. 
Furthermore, Patricia reported to Dr. Hauptman that she had rheumatoid arthritis. 

 Patricia testified that prior to moving to Corpus Christi, she had seen a
rheumatologist (6) in Tyler, Texas, for pain she was experiencing in her hands. The
rheumatologist told her that "any soft tissue swelling was rheumatoid arthritis." However,
laboratory testing for rheumatoid arthritis was not conducted on Patricia at that time. 
Patricia explained that she reported this as part of her history to Dr. Hauptman because
she did not want to leave out anything that might be important. She stated that the joint
pain she experienced was not significant and that at the time she first went to Dr.
Hauptman, she was not taking any medication for joint pain. (7) Dr. Hauptman's notes from
Patricia's first visit state that she reported a "rheumatoid arthritis history" and stated that
"her hands and hips bother her the worst." 

 Dr. Hauptman referred Patricia to a primary care physician, Robb Sherron, M.D.,
and to a respiratory therapist, identified only as Dr. Miller, for her sarcoidosis. Dr. Miller
performed lab work on June 19, 2000. At that time, Patricia tested negative for rheumatoid
factor, which is the indicator for rheumatoid arthritis. Dr. Hauptman conceded that he
never saw any laboratory testing that indicated that Patricia had rheumatoid arthritis. 
Additionally, Patricia's chest x-ray showed no signs of sarcoidosis. During this time,
Patricia's Crohn's disease was asymptomatic. 

 In September 2001, Patricia's Crohn's disease again became symptomatic. In
December 2001, after conducting diagnostic tests, Dr. Hauptman determined that Patricia
was suffering a "moderate flare" of her Crohn's disease. Based on her existing medical
regimen and her reported allergic reaction to the 5-ASA category of drugs, Dr. Hauptman
testified that Patricia's only two treatment options were steroids or Remicade. 

 Dr. Hauptman claimed that he discussed both options with Patricia. He testified that
Patricia did not want to take steroids because she did not like how she felt when she took
them. Although Patricia claimed that Dr. Hauptman did not offer her a course of steroids
as an option, she agreed that she probably told Dr. Hauptman that she did not like steroids. 
Dr. Hauptman testified that he also discussed the risks of using Remicade, including the
risk of developing a lupus-like syndrome. Patricia and Thomas, however, denied that Dr.
Hauptman ever discussed the risk of lupus-like syndrome. Patricia testified that in
December 2001, she did not know what lupus or lupus-like syndrome was, and that having
that knowledge would have been important to her. Dr. Hauptman prescribed an induction
series of three doses of Remicade to be administered at an infusion clinic over a six-week
period from December 19, 2001, to January 30, 2002. 

F. The Centocor Video

 Dr. Hauptman referred Patricia to the infusion clinic of Michael G. Bullen, M.D., to
receive the Remicade infusions. (8) Patricia first went to the clinic on December 17, 2001,
to receive a tuberculosis test, which must be performed before Remicade can be started. 
At that time, Polly Swinney, a nurse at the infusion clinic, took a history from Patricia. 
Swinney noted that Patricia reported a history of arthritis, but Patricia did not report any
pain associated with the arthritis at the time she first came to the clinic.

 Dr. Bullen testified that because the decision to take Remicade has already been
made by the time a patient arrives at his infusion clinic, he does not typically warn patients
about adverse side effects, except to provide them information about reactions that might
occur during the infusion process. Dr. Bullen testified that he has a computer that prints
out drug information sheets. He claimed that when Patricia came to the infusion clinic on
December 19, 2001, for her first infusion, he gave Patricia one of these sheets. He did not
have a copy of the exact sheet that he gave Patricia, explaining that the computer is now
updated with new information. However, a copy that he printed out in 2004 right before
trial did not contain a warning about lupus-like syndrome. Dr. Bullen testified that he did
not warn Patricia about lupus-like syndrome. 

 Swinney stated that she does not review drug package inserts with patients, and she
did not review the package insert for Remicade with Patricia at any time. Rather, she
completes a "Patient Teaching Checklist," which requires her to advice patients of only the
following side effects: "headache, chills, fever, nausea, vomiting, dyspnea, vertigo, upper
respiratory infections, hypertension, [and] hypotension." Swinney testified that these side
effects were expected and watched for during the infusion process itself. 

 In addition to the checklist, Swinney showed patients a video produced by Centocor. 
On December 19, 2001, while Patricia was receiving her first infusion, she was shown the 
Centocor video, which Dr. Bullen referred to as a "treatment companion" kit. Dr. Bullen
testified that the purpose of the video was to show "some of the effects of the drug on
certain people. . . . It's very dramatic in some people."

 The video was shown to the jury. It begins by showing a woman with her family
("Patient 1"). Patient 1 states that she has had 

 this condition for a while now, and it's stopped me from doing the everyday
things that I used to do all the time. I have two children, and [it] was very
hard for me to fulfill what they expected their mom to do. My quality of life
was deteriorating, and I was not happy.


Next, a man appears ("Patient 2"). He states: "I've tried several different drugs. Some
were more successful than others, but none really lasted a long time." A different woman
then appears ("Patient 3"). She is shown moving about her kitchen normally, opening the
refrigerator. Patient 3 claims she was "not able to do a lot of things that I would have liked
to have done. I felt like my life was limited."

 Patient 1 appears again and states:

 We couldn't control what I had and the doctors really were trying many
different medications for me. And basically things just went from bad to
worse. The decision to try Remicade was made with my doctors. It was
presented to me that this might help.


While Patient 1 is speaking, she is shown walking normally down the street and into a
building. A nurse appears and explains that the infusions can take place in a hospital or
an infusion clinic. Patient 1 enters an infusion clinic and is greeted by a nurse in a friendly
manner.

 A doctor appears, identified as Alan Safdi, M.D., who explains that Remicade is
administered by intravenous infusion. Dr. Safdi explains the infusion process, and Patient
1 begins receiving an infusion. She is smiling and looks comfortable. She says that the
worst part of the procedure is inserting the needle into a vein. Dr. Safdi explains that the
infusion lasts two to three hours. The three patients then take turns explaining how, during
the infusion process, people sleep, eat, watch television, read, or make friends. The video
paints a portrait of a relaxed atmosphere. 

 Patient 1 explains that a doctor comes to check on her during her infusions. She
states that he is checking to see if "anything immediate is happening during the infusion." 
Dr. Safdi then states: 

 Physicians should discuss with their patients all potential side effects that
may occur during these infusions. There are reports of serious infections,
including sepsis and tuberculosis, that may be life threatening. So if you are
prone to or have a history of infections, currently have one or develop one
while taking Remicade, tell your doctor right away. Also tell your doctor
before beginning treatment if you have had recent close contact with or if you
have had past exposure to people with tuberculosis, or if you have any other
reason to believe you may be at risk. There are also reports of serious
infusion reactions like hives, difficulty breathing, and low blood pressure. If
you have a demyelinating disease such as multiple sclerosis, tell your doctor
before you are treated. In rare cases people with demyelinating disease who
were treated with Remicade have seen their symptoms intensify. Up to one
in four people experienced the following side effects in clinical studies: upper
respiratory infections, headache, nausea, cough, sinusitis, or mild reactions
to the infusion such as rash or itchy skin. But the vast majority of patients,
in our experience, have no problems with the infusion. 


 Dr. Safdi explains that after the infusion, patients are kept at the infusion center for
thirty minutes for observation and that most people drive themselves home. Patient 2 says
that after his infusions, he can do whatever he wants, like "grab something to eat. I can
go back to work if I like. I can go to the park, whatever I would ordinarily have done." The
video shows Patient 1 getting up from the chair in the infusion center and leaving.

 Dr. Safdi then says: 

 After the infusion there are very little side effects that people need to watch
for. If they have any discomfort, we ask them to give us a call. But those
reactions, again, are extremely rare. And the vast majority of patients really
experience no side effects. 


 The video again shows Patient 1 walking down the street. She says:

 I usually feel really good after the infusion and then when I get home I realize
I'm tired. My husband will come home early from work and let me rest a little
bit. But that's about it. And then I start feeling better. Really better. And
that's what I look forward to.


 Dr. Safdi appears again and explains that patients may not have a "peak" effect for
a week or two after infusion. He says that the drug is "quite effective." A disclaimer
appears on the screen that says, "RESULTS MAY VARY."

 Patient 1 is shown again walking down the street and purchasing flowers, then she
meets her family. She picks up her children and hugs them. Then she states, "Remicade
is the drug that helped me get better. People who [sic] want to know if that's going to make
them feel better, and for me, it worked."

 Patient 2 is shown getting on and off a subway train and jogging up the stairs out
of the subway station. He claims, "Since I began taking the drug, the quality of my life has
definitely improved." Dr. Safdi then exclaims, "I'm extremely enthusiastic about this whole
new class of drugs! We've helped people with disease that hasn't responded to other
forms of therapy." Patient 3 appears in her kitchen making coffee. She states, "I would
definitely tell someone to try Remicade. It's definitely helped me." Dr. Safdi then says,
"This is a new era for medicine. This type of therapy. And it's provided a lot of people
tremendous benefit. And I wouldn't be scared of the infusion process in and of itself." 
Patient 2 is shown throwing a ball with his dog. He states, "It's been nothing but a great
success for me."

 Finally, Patient 1 is shown walking down some stairs holding her children's hands. 
She easily picks one of her children up. She states, "The fact that there is no cure for my
condition makes it very difficult, but having a drug that's going to give me back my quality
of life is the best that we could ask for."

 At the end of the video, a disclaimer rolls down the screen that says:

 If you have any questions after watching this video, talk to your healthcare
provider. You can also visit our website at www.remicade.com for more
information on REMICADE. 


 This video should not be used as a substitute for talking with your doctor. 


 Indications 


 REMICADE (infliximab) is indicated for the treatment of rheumatoid arthritis
and Crohn's disease. 


 Rheumatoid arthritis 


 REMICADE, in combination with methotrexate, is indicated for reducing the
signs and symptoms and inhibiting the progression of structural damage in
patients with moderately to severely active rheumatoid arthritis who have had
an inadequate response to methotrexate.


 Crohn's Disease 


 REMICADE is indicated for the reduction in signs and symptoms of Crohn's
disease in patients with moderately to severely active Crohn's disease who
have had an inadequate response to conventional therapies. The safety and
efficacy of therapy continued beyond a single dose have not been
established.


 REMICADE is indicated for the reduction in the number of draining
enterocutaneous fistulae in patients with fistulizing Crohn's disease. The
safety and efficacy of therapy continued beyond three doses have not been
studied. 


 REMICADE should not be administered to patients with known
hypersensitivity to any murine proteins or other component of the product.


 There are reports of serious infections, including sepsis and tuberculosis,
that may be life-threatening. So, if you are prone to or have a history of
infections, currently have one, or develop one while taking REMICADE, tell
your doctor right away. Also tell your doctor before beginning treatment if
you have had recent close contact with, or if you have had past exposure to
people with tuberculosis, or if you have any other reason to believe you may
be at risk. There are also reports of serious infusion reactions with hives,
difficulty breathing, and low blood pressure. If you have a de-myelinating
disease such as multiple sclerosis, tell your doctor before you are treated. 
In rare cases, people with de-myelinating disease who were treated with
REMICADE have seen their symptoms intensify. Up to one in four people
experienced the following side effects in clinical studies: upper respiratory
infections, headache, nausea, cough, sinusitis or mild reactions to the
infusion such as rash or itchy skin. (Please see the accompanying Full
Prescribing Information). 


 It is undisputed that the video did not list lupus-like syndrome as a potential side
effect. Patricia said that after watching the video, she "felt very good about Remicade
treatment." She explained, "I thought it was going to change my life and make me feel
great like all the people in the video." Patricia stated that she did not have any concerns
about taking additional infusions after watching the video and did not believe she needed
to do any additional research. Thomas testified that he watched the video with Patricia at
the infusion clinic. He stated that the video "didn't really address anything about safety, but
everybody seemed to be very happy to have it, on the videotape."

 Swinney testified that the videotapes from Centocor come in boxes wrapped in
cellophane and that the boxes containing the videos usually come with "the video, a couple
of brochures in there to tell about the drug . . . and it usually comes with the package insert
that comes also with the medications." She stated that the package insert "tells all sorts
of things about the medication itself: [h]ow it was manufactured, some of the testing that
was done, the side effects, adverse reactions, all those sorts, and the dosing." She
testified that the "full prescribing information" refers to the package insert. Swinney
admitted, however, that she opened the box and removed the videotape to show Patricia
the video. Swinney claimed that after Patricia watched the video, Swinney put the video
back in the box and gave Patricia the box to take home. 

 Patricia came back to the infusion center for two more infusions of Remicade, one
on January 2, 2002, and another on January 30, 2002. At some point in between the first
and second infusions, Swinney gave Patricia a different Centocor video to take to her
sister, who had rheumatoid arthritis. This video was marked as Plaintiff's Exhibit 35. The
box containing this video has a plastic sleeve on the inside cover that contains the package
insert for Remicade. 

 The video shown to Patricia at the infusion center, however, was marked as
Plaintiff's Exhibit 34. It does not have a plastic sleeve on the inside to hold any written
materials, and the box only contains the video. Swinney admitted that if any written
materials were in the box, she would have had to remove them to access the video. 
Swinney claimed that after she showed the video to Patricia, she put the video back in the
box and placed the written information on top before she shut the box. Patricia, however,
testified that she was not offered any written materials along with the video. Patricia
denied that the box Swinney gave her containing the video she watched had any written
information in it. Patricia stated that she never opened the box again after watching the
video at the infusion center, and if there was any written information provided, it would
have been in the box when she gave it to her lawyer.

 Swinney testified that after starting the videotape, she did not review any other
materials with Patricia, and she did not give her any written materials regarding the side
effects of Remicade. Swinney further stated that she did not discuss the possibility of
lupus-like syndrome with Patricia. 

 Initially, Patricia had a good response to the Remicade therapy. After her first
infusion, Swinney called Patricia to see how she was doing, and Patricia reported that she
was already feeling better. At her second infusion, Patricia told Swinney that "she hadn't
felt better in a long time and that she [felt] like she was getting relief from her arthritis pain
as well as her Crohn's disease." After two infusions, Dr. Hauptman performed a
colonoscopy that indicated to him that Patricia's Crohn's disease was in remission. At her
third infusion on January 30, 2002, Patricia reported to Swinney that she was still feeling
much better. At that point, Patricia believed that she would only receive three Remicade
infusions and would be done. It is undisputed that since receiving Remicade, Patricia has
not had any problems related to her Crohn's disease, which is still in remission. 

G. Patricia's Decline and Treatment by Adriana Pop-Moody, M.D.

 Patricia explained that in March 2002, she began having "all kinds of joint pain and
was having a lot of difficulties." She testified that she had a rash all over her body, her
throat hurt, and she was hurting all over. Thomas testified that Patricia was in so much
pain that she could not dress herself or perform her normal functions. She went to see Dr.
Sherron, her family practitioner. He ordered blood work, and Patricia then tested positive
for rheumatoid factor and for ANA. Dr. Sherron referred Patricia to Dr. Pop-Moody, a
rheumatologist. Patricia first visited Dr. Pop-Moody on April 3, 2002. 

 Dr. Pop-Moody sent a letter to Dr. Sherron after Patricia's first visit. She
summarized the appointment and her view of Patricia's condition:

 Mrs. Hamilton has had Crohn's disease since the age of 6 and for many
years she had joint pains. Initially the hands were involved. She had
swelling and pain then the right foot and the right hip. She did not have lots
of functional limitation and lots of discomfort in the joints[,] and they all got
better when she was having the treatment done for Crohn's with steroids or
Imuran. In December and January she received the Remicade treatment. 
She received three doses. The first and second doses were two weeks
apart[,] and the third was one month apart[,] and the Crohn's symptoms
improved dramatically along with the joint symptoms. Approximately eight
weeks after the last dose of Remicade she had a big flare-up of joint pains[,]
and new joints are involved this time. The hands and the right foot are very
inflamed, very painful[,] but now she has shoulder pain with diminished range
of motion, ankle pain and swelling, wrist and neck pain, thoracic pain[,] and
also low back pain. She reached the point that she could hardly use her
hands. Also, she cannot dress herself, not having enough range of motion
in the shoulders.


 Dr. Pop-Moody testified that Patricia told her that the three doses of Remicade had
dramatically alleviated her arthritis pain, but in the two months since her last treatment, she
had experienced a "flare" of arthritis pain. Dr. Pop-Moody prescribed a low dosage of
prednisone, which is a steroid. She also prescribed further infusions of Remicade. Patricia
testified that, at that point, she believed that she had developed rheumatoid arthritis and
would be on Remicade for the rest of her life. 

 At Dr. Pop-Moody's direction, Patricia received an infusion of Remicade on April 10,
2002. Patricia testified that when she received a Remicade infusion, she would have a
period of relief where she could resume her normal activities. After the infusion in April,
Patricia misunderstood that she was supposed to slowly taper-off her prednisone, and she
stopped the medication too early. She suffered a severe flare of arthritis starting on May
12, 2002. Her pain was so bad that she could not sleep, could barely walk, and could
barely get in and out of cars. Dr. Pop-Moody prescribed prednisone again, and Patricia
got slightly better. 

 Patricia's second infusion of Remicade under Pop-Moody's care was on May 23,
2002. When she saw Dr. Pop-Moody on June 27, 2002, Dr. Pop-Moody observed that
Patricia was doing "better on Remicade," but for the week prior to the visit, Patricia's hands
had become stiff and painful with some loss of grip strength. Dr. Pop-Moody testified that
she conducted lab work, and Patricia was positive for ANA. Dr. Pop-Moody explained that
she was not concerned with lupus-like syndrome at this point:

 Everybody has the perception--and doctors, lots of doctors, if you have
positive--are positive ANA, hey, I might have lupus. . . . And also, it's not
only that, there is another test which is more specific for lupus. So the ANA
test, it's like a screen test for lupus, and if you have a positive and you have
no symptoms, because there are very good criteria to diagnose lupus, then
you're gonna go further down, and they're trying to see if you have any other
antibodies, auto, --we call it "autoantibodies" of immunity, --autoantibodies,
which could suggest that you have a connect tissue disease, and lupus is
number one. Now, what is very particular for all these medications, for the
Remicade and for Imuran and Humira, all of them, they are--they have a
degree of immunogenicity, as he mention [sic], many times. And you are
gonna have this test positive, too. 17--I think the number went a little bit
higher, because now they see more and more, about 19 percent of patients
who are on this medication are gonna have this positive test for lupus. Now
when we go to double-stranded DNA, because I did that, too, she had--but
it had no significance. 20 percent of these patients are gonna have a
positive and we are gonna just watch and see what's happening. But, you
know, as we mentioned, we knew that the lupus-like syndrome is very rare,
but you get prepared for it. You get your stuff there and you watch it,
because this is what you need to do.


At that point, Dr. Pop-Moody planned to begin weaning Patricia off of her prednisone and
to continue giving her Remicade treatments every two months.

 Patricia had a third Remicade infusion under Dr. Pop-Moody's care on July 10,
2002. She finished taking prednisone on July 28, 2002. Dr. Pop-Moody saw her again on
August 9, 2002. Dr. Pop-Moody testified that after stopping the prednisone, Patricia
started experiencing more pain in her shoulders, elbows, wrists, and hands. Dr. Pop-Moody's notes indicate that Patricia was "very stiff in the morning and pretty
uncomfortable[,] and at night she has problems sleeping due to the pain." Her notes also
indicate that "[t]he labs done on 6/27 showed a positive ANA and anti-[ds]DNA was also
positive at 35. She had normal complements and the ENA screen was within normal
limits." Her notes state that Patricia had "[p]ositive serology for SLE." 

 Dr. Pop-Moody explained that these test results were not enough to diagnose
Patricia with lupus-like syndrome because according to her, twenty percent of patients on
Remicade will test positive for ANA and double-stranded DNA antibodies. Dr. Pop-Moody
prescribed a shot of kenalog instead of prednisone and decided to continue Remicade
treatments every two months. 

 Patricia had another Remicade infusion on August 28, 2002, and she saw Dr. Pop-Moody on September 20, 2002. Dr. Pop-Moody testified Patricia had an "excellent
response" to this treatment, but by the time another treatment was due, Patricia was again
experiencing pain. Dr. Pop-Moody testified that at that time, she did not foresee Patricia
ever being able to stop treatment with Remicade. 

 Patricia's fifth Remicade infusion prescribed by Dr. Pop-Moody was on October 14,
2002. At an office visit on November 15, 2002, Patricia reported that she was experiencing
a "flare of arthritis all over for the last ten days." Patricia told Dr. Pop-Moody that the
Remicade enabled her to function fully and normally, but it was only effective in controlling
her arthritis pain for a few weeks following each treatment. At that time she was
experiencing neck pain, shoulder pain, and wrist and hand pain with swelling. Her hips,
knees, ankles, and feet were very painful and stiff. At this point, Dr. Pop-Moody decided
to increase the dose of Remicade and decrease the interval between infusions. Her notes
indicate that she believed that Patricia "functions very well with this medication[,] and it is
worth it to change the schedule of administration."

 Patricia's sixth Remicade infusion under Dr. Pop-Moody's care was on November
25, 2002, and her seventh infusion was on January 9, 2003. At an office visit on January
17, 2003, Patricia 's joint pain had improved. However, Patricia reported that she had an
upper respiratory infection in the first part of January involving a cough, fever, chest
pressure, and another flare of joint pain. She had been admitted to the emergency room
and was diagnosed with pericarditis. Patricia reported that after receiving Remicade on
January 9, her joint pain was much improved, and she generally felt better. Dr. Pop-Moody's notes indicate that she believed the "[a]cute pericarditis [was] most likely viral in
nature. There is a possibility of an autoimmune pericarditis as well." Dr. Pop-Moody
decided to continue the Remicade infusions.

 Dr. Pop-Moody saw Patricia again on January 24, 2003. At this time, Patricia
reported feeling fatigued and was experiencing more shortness of breath than previously. 
Dr. Pop-Moody noted that an echocardiogram was performed that showed a small
pericardial effusion. Patricia had suffered weight loss of twelve pounds. In her
assessment, Dr. Pop-Moody noted that the pericarditis was "most likely viral in nature but
in the presence of diagnosis of sarcoidosis[,] a flare-up of this condition should be
considered too even though the patient received immunosuppression and also the
Remicade treatment." Dr. Pop-Moody again prescribed prednisone, and she saw Patricia
again on January 31, 2002, to monitor her prednisone use. 

 On February 20, 2003, Patricia had an eighth infusion of Remicade prescribed by
Dr. Pop-Moody. On March 27, 2003, Patricia called Dr. Pop-Moody's office to report that
she was running a high fever and had pain all over her body. At an office visit on April 4,
2003, Patricia again complained of joint pain in her shoulders, neck, wrists, hands, and
ankles. Patricia reported having a fever of 102 degrees and chest pain on the left side of
her chest, which was exacerbated by breathing and movement. Patricia had seen Dr.
Sherron on March 31, 2003, who performed an echocardiogram and a chest x-ray. There
were no signs of pleurisy (9) or pericarditis at that time. Dr. Pop-Moody's assessment was
that "there [was] a question between rheumatoid arthritis and enteropathic arthritis. The
patient has positive serologies for rheumatoid factor[,] which makes the diagnosis of
rheumatoid arthritis more likely[,] but at the same time she has inflammatory bowel disease
which could present the same way too." Additionally, Dr. Pop-Moody's notes reflected
"[p]ositive serology for SLE which could be induced by Remicade[,] but now there are other
questions about her developing clinical lupus in view of previous pericarditis and the chest
pain which she had recently which are highly suggestive of pleurisy." 

 Dr. Pop-Moody testified that at that time, she believed that the development of
lupus-like syndrome associated with Remicade was an extremely rare situation, and it was
"[l]ow on the differential." She stated that based on the package insert's description of only
three cases of lupus, she believed it was extremely unlikely that Patricia had lupus-like
syndrome. Nevertheless, Dr. Pop-Moody's notes indicate that she discussed the possibility
of lupus-like syndrome with Patricia:

 I discussed with the patient all these possibilities[,] and we might need to
stop the Remicade at this point. Positive serology for lupus is not unusual
with the Remicade[,] but developing symptoms of lupus would indicate that
the patient has the condition and then the Remicade infusions won't be so
helpful. At the present moment, she doesn't want to give up the Remicade
infusion because she is feeling very well for about five to six weeks after the
infusion[,] and we decided to go ahead with this infusion[,] and after that we
really need to weigh the advantages or disadvantages of alpha inhibition in
her case[,] and we (me and the patient) need to make a joint decision about
the future of her treatment.


Dr. Pop-Moody testified that she decided to run more lab work to test Patricia's ANA levels
and to look for "complements," which she explained were important to diagnosing lupus-like syndrome. She explained that if the "complements" go down and the double-stranded
DNA goes up, then she would be worried.

 On April 7, 2003, Patricia had a ninth infusion of Remicade under Dr. Pop-Moody's
care. Dr. Pop-Moody received a call from Patricia on April 21, 2003, and Patricia asked
if she could lower her prednisone dosage because she was feeling better. Dr. Pop-Moody
agreed, but on April 23, 2003, Patricia came to Dr. Pop-Moody complaining of pain in her
chest when she took a deep breath. Dr. Pop-Moody's notes indicate that she received the
test results from the lab work she ordered earlier in April: 

 With the last visit I repeated a rheumatoid factor[,] and surprisingly the
rheumatoid factor is negative. The ANA panel showed again a positive ANA
and positive double [stranded] DNA at a lower titer. This time it was 28[,]
and the patient had a titer of more than 35 one year ago. Also, the
complements were within normal limits.


Dr. Pop-Moody's assessment and diagnosis in her notes show that by the end of April
2003, she was seriously considering whether Patricia may have SLE or drug-induced
lupus:

 Inflammatory arthritis most likely enteropathic arthritis. Initially we
considered rheumatoid arthritis due to the positivity of rheumatoid factor
which almost excluded an enteropathic arthritis which belongs to the group
of seronegative spondyloarthopothy which are supposed to be seronegative. 
Many times when we are dealing with autoimmune diseases you can see the
switching of serologies with the same clinical complaints. The positivity of
ANA and anti-DNA was considered up until now being induced by TNF alpha
therapy but in view of the pericarditis which the patient had in the month of
February, the possibility of SLE is raised. There are reports cases [sic] to
develop clinical SLE meanwhile they are taking TNF alpha inhibition. I
discussed with the patient extensively all of these possibilities[,] and still we
do not have a firm diagnosis of lupus due to the fact that the time when she
had the pericarditis she did have symptoms of an upper respiratory infection. 
The patient is aware of the fact that the TNF alpha therapy can induce a
lupus flare which we have as an underlying condition[,] but at the present
moment she does not want to stop the Remicade treatment because this
stabilized her Crohn's symptoms which were very pronounced. She had
repeated surgeries done for it[,] and she does not want to return to that
situation again. Also, the joint pains and stiffness are very well controlled
with Remicade[,] and this enables her to integrate normally in her life so she
is very reluctant to stop the medication especially if I do not have anything
else to offer her. Consequently she is going to read more about SLE
symptoms[,] and we will follow her very closely.


Dr. Pop-Moody testified that she gave Patricia literature on lupus and that Patricia was
going to read it. She claimed that she advised Patricia of the symptoms of lupus-like
syndrome, such as rashes and "chest pains which come and go, and they hurt you when
you take a deep breath." Dr. Pop-Moody admitted that the increased joint pain that Patricia
experienced could be from drug-induced lupus-like syndrome. 

 Thomas recalled that Patricia came home from an appointment with Dr. Pop-Moody
with a pamphlet on lupus, and he stated that Patricia "was supposed to go through these
lupus symptoms and decide whether or not--or to decide whether or not she was having
any of these symptoms. This way, they could talk about it next time they met." Patricia
testified that she recalled Dr. Pop-Moody discussing lupus with her in the Spring of 2003,
although she did not specify the exact date. However, Patricia denied that Dr. Pop-Moody
informed her that the Remicade could be causing drug-induced lupus; she testified that she
decided to continue on Remicade because she believed, at that time, that Remicade was
the only option to provide her with any relief. She testified that she did not know that
Remicade was the cause of her problems at that time.

 Dr. Pop-Moody's notes, however, were sent to Dr. Sherron, and in her analysis, she
noted that Patricia was considering legal action against Centocor:

 I do not know if you are aware that she is looking for legal action against
Centacor [sic]. The patient wants to have part of her co-pay paid by
Centacor [sic] because she thinks that she started having the joint
complaints so pronounced only after the Remicade was given to her. In my
opinion she benefitted from Remicade extremely due to the stabilizing of her
Crohn's symptoms and also of the joint symptoms but we are in a sensitive
situation and she has to take the responsibility to go ahead with this
treatment as long as we have a suspicion of lupus and not to make anybody
responsible in case we have more complications. I am not sure how she is
going to react to these problems but I want you to be informed about all
these developments.


Patricia explained that "at that time my understanding was I would be on this drug
indefinitely and the Remicade had actually caused the flare of rheumatoid arthritis that I
was now suffering from and having to be treated with the same drug." She believed that
she would have to continue Remicade indefinitely. 

 On May 13, 2003, Patricia had her tenth Remicade infusion, followed by another
infusion on June 10, 2003. On June 27, 2003, Patricia saw Dr. Pop-Moody. Patricia
reported that prior to her infusion on June 10, she experienced aches in almost all of her
joints and had prolonged stiffness in the morning. Patricia also complained of shortness
of breath but no chest pain. Dr. Pop-Moody testified that at that time, there was nothing
indicating to her that Patricia had SLE or drug-induced lupus-like syndrome.

 Patricia had three more Remicade infusions on July 8, August 5, and September
2, 2003. Dr. Pop-Moody examined Patricia after her infusion on September 2. Dr. Pop-Moody noted that the August infusion only provided relief for two weeks, and then Patricia
had a big flare of joint pains and swelling in the shoulders, hands, knees, hips, and feet. 
Dr. Pop-Moody's notes indicate that the "joint pains are getting more and more
pronounced." They also indicate that Dr. Pop-Moody decided to stop the Remicade
therapy while Patricia sought a second opinion: "We had an extensive discussion about
the situation that at the present time there is no use for Remicade anymore. . . . I am
reluctant to provide her with this medication anymore without having a second opinion."

 Dr. Pop-Moody testified that by this time, Patricia's flares of joint pain were
becoming more intense, and the duration of the relief periods following each treatment was
becoming shorter. Dr. Pop-Moody referred Patricia to a group of physicians at the
University of Texas Health Science Center in Houston for consultation and treatment. 

H. The Houston Doctors

 On September 30, 2003, Patricia went to the University of Texas Health Science
Center in Houston and saw Maureen D. Mayes, M.D.; Noranna B. Warner, M.D.; and
Leslie Wilson, M.D. Thomas claimed that he first heard the term "drug-induced lupus" in
Houston from Dr. Warner. Patricia testified that it was not until she went to Houston that
she discovered that the Remicade was causing her problems. 

 Dr. Mayes and Dr. Wilson wrote a letter to Dr. Pop-Moody on September 30 after
seeing Patricia. The doctors made the following assessment:

 1. Symmetric polyarthritis involving the hands, elbows, shoulders, knees,
and feet that could be consistent with lupus (potentially drug-induced
by Remicade), although the literature is limited in supportive evidence
of this entity. There have been several studies showing that the
presence of double stranded DNA antibodies in patients who receive
Remicade is not uncommon; however, there have been limited cases
of lupus-like syndrome seen with this medication. The patient, at this
time, does appear to have a syndrome that could be classified a
systemic lupus erysthematosus. The clinical picture is less consistent
with sarcoidosis[ (10)] or arthritis associated with sarcoidosis. The clinical
presentation could be consistent with enteropathic arthritis. This
could be arthritis associated with hepatitis C virus.


 2. Leukopenia--possibly secondary to lupus-like syndrome or a side
effect of Imuran. . . . 


The doctors decided to discontinue further treatment with Remicade because Patricia 
apparently was no longer benefitting from it. Instead, they prescribed increased dosages
of other medications Patricia had taken off and on, including prednisone. The doctors
planned to follow Patricia's serologies for the next few months to monitor her "ANA, anti
double stranded DNA, and anti histone level." 

 At a second visit on October 15, 2003, Patricia 's condition had improved. In a letter
to Dr. Pop-Moody, the Houston doctors wrote:

 The patient presented to our clinic for evaluation of possible lupus-like
syndrome which may have been induced by Remicade therapy. Upon
evaluation by her rheumatologist in Corpus Christi, the patient was found to
have a positive ANA and positive double-stranded DNA antibodies. Other
significant history included the episode of pericarditis in January of 2003 and
the presence of leukopenia (absolute lymphopenia). Upon initial
presentation to our clinic a few weeks ago, the patient's physical exam
showed significant tenderness on internal and external rotation of both of her
shoulders. There was also some swelling of the fingers, particularly in the
PIP joints bilaterally. There was decreased hand grip secondary to pain.


 Today, the patient states that she is much improved since her previous visit. 
She was able to go to the zoo earlier this week and was able to walk around
for approximately 4 hours without significant joint pain. She has resumed her
daily activities including dressing herself and caring for herself without
needing assistance from her husband. The patient states that she has no
significant morning stiffness at this time. She occasionally has some pain in
her shoulders and upper extremities but feels that she is much improved
since her last visit.


 . . . .


 ASSESSMENT: Symmetric polyarthritis involving hands, shoulders, knees,
feet, which is consistent with a lupus-like syndrome (potentially drug-induced
by Remicade). The patient has improved on an increased dose of Imuran
150 mg daily, increased from 100 mg daily. The patient also had increased
her prednisone dose from 10 mg daily to 15 mg daily.


 It was undisputed that after Patricia stopped taking the Remicade, her arthritis pain
improved completely. Patricia testified that, had she known that Remicade could cause
lupus-like syndrome, she would have asked more questions before making a decision to
take Remicade. 

I. Expert Testimony on Patricia's Diagnosis

 Dr. Ertan testified as an expert for Centocor. He reviewed the notes from the
Houston doctors, and he stated that he agreed with them that Patricia appeared to have
lupus-like syndrome. Additionally, Dr. Olsen was hired by Centocor to provide expert
testimony, but she was called by the plaintiffs to testify as an adverse witness. Dr. Olsen
testified that it was her opinion that Patricia had drug-induced lupus. She explained:

 In terms of diagnosing a lupus presentation, there are certain clinical criteria
that are used. That includes symptoms, signs, and then there's laboratory
studies. In terms of drug-induced, obviously, it's not only the diagnosis of
lupus, but whether there was a drug pre [sic] that set it off. And then once
you remove the offending drug symptoms go away. And then there can be,
in addition, certain antibodies in drug-induced lupus called "antihistone
antibodies" that are important. So in terms of the rationale for lupus--I'm still
flipping through my pages, here. I might have in this paragraph new
features, including joint swelling, positive ANA, positive double-stranded
DNA, positive antihistone antibody, leukopenia, lyphoepenia, rash, history of
oral ulcers, fever and seritosis with a pericardial effusion. All of those are
clinical features that could be suggestive of lupus, and antihistone antibody,
specifically drug-induced lupus. There was some pleuritic chest pain. There
can be serositis or pleurisy in lupus. However, she did have the complicating
history of sarcoid, so one with good emphasis [would] know whether that
could be sarcoid or lupus-related. But those were the rationale for that.


Dr. Olsen testified that she believed Patricia's symptoms revealed a discernible case of
lupus-like syndrome in January 2003, when Patricia developed pericarditis. Dr. Olsen
explained why she believed that was a determinative factor:

 Because prior to that, her joint complications had certainly worsened, but it
was not clear-cut what that worsening was due to. Certainly, rheumatoid
arthritis would have been an initial consideration, because she did have a
bilateral symmetric polyarticular synovitis process, which is a classic feature
for rheumatoid. Certainly, it could have been enteropathic arthritis. I find
that a little less likely, because of her treatment of multiple joints. And some
of the other serologic features, her blood test features, her painful ANA
positivity, and [anti-]dsDNA positivity, in the study of TNF blocker use can be
seen just along for the ride and not actually be pathogenic, so those features
still don't make you have to reassess the situation. But a pericardial effusion
does get one's attention to say, well, what could this be due to? Is it an
infection? Is it related to the arthritis? Rarely in rheumatoid it can occur. Is
it related to perhaps a drug-induced lupus? Yes, it could be seen in that. So
one would have to be rethinking it at that point. 


 Dr. Olsen testified that she believed early on, Patricia received some relief from the
Remicade, but later, as the pain worsened, Dr. Olsen believed that more of the relief was
coming from steroids. James Wild, M.D., Dr. Bullen's expert witness who was called as
an adverse witness by the Hamiltons, testified that a patient who receives steroids and
Remicade could believe that the relief she were getting was coming from the Remicade
therapy when, in fact, the Remicade was making it worse. When asked if he believed if
"information to a patient who has conditions like Mrs. Hamilton had, that Remicade therapy
could induce lupus, could have influenced--could influence that patient in deciding not to
take the Remicade," Dr. Wild stated, "Possible, yes." 

 David Trock, M.D., an expert for the Hamiltons who was called as an adverse
witness by Centocor, also testified through his deposition testimony that he believed that
Patricia developed "systemic lupus . . . in the middle of 2002." When asked how to
distinguish systemic lupus from drug-induced lupus and whether Patricia had drug-induced
lupus-like syndrome, Dr. Trock explained:

 Well, a few things to consider. [Patricia] did fulfill the 1982 ACR criteria for
lupus in the year, certainly in early 2003. If it's necessary to distinguish drug-induced lupus from systemic lupus there are a few things that are ordinarily
done. And one of them is to determine if there's an offending agent
responsible, to withdraw it, and see what happens to the patient. And as far
as I'm aware of the record, that's what happened. So she did indeed have
lupus in probably as early as mid 2002, and the notion of drug-induced lupus
along the way. I'm not exactly sure when but certainly in January of '03
when she was admitted to a hospital with pericarditis, to me it was no more
question. The setting of the right serology, lyphopenia, leukopenia, and
pericarditis that she at least had lupus, be it drug-induced or systemic, at that
time it wasn't clear. But in retrospect I would say that it was drug-induced
because the presence of histone antibodies and the clinical improvement
upon stopping the offending agent which in this case was Remicade. 


Dr. Trock then stated that it was his opinion that Patricia had drug-induced lupus, which
manifested itself physically in Patricia by the arthritic pain she experienced and the
pericarditis. 

J. The Jury's Findings and the Judgment

 The Hamiltons sued Centocor on March 19, 2003, (11) and later named Dr. Hauptman,
Dr. Pop-Moody, Dr. Bullen, and Dr. Bullen's infusion clinic as defendants. The petition
alleged that Centocor committed fraud, among other causes of action. (12) The Hamiltons
alleged that Dr. Hauptman, Dr. Pop-Moody, and Dr. Bullen failed to adequately warn her
of the risks associated with Remicade and failed to obtain her informed consent to such
treatment. Following a jury trial, the trial court granted a directed verdict in favor of Dr.
Bullen and his infusion clinic. 

 The jury found that Centocor was liable for fraud. (13) It awarded Patricia $1.2 million
for past pain and mental anguish, $1 million for future pain and mental anguish, $1.1
million for past physical impairment, and $65,908.00 in past medical care expenses. The
jury also awarded Thomas $50,000.00 for loss of consortium and household services. The
jury apportioned liability for Hamilton's damages as follows: Centocor, 85%; Dr. Pop-Moody, 10%; and Dr. Hauptman, 5%. The jury found that the fraud was established by
clear and convincing evidence, and it awarded Patricia $15 million and Thomas $1 million
in exemplary damages for Centocor's fraudulent conduct. 

 Before entry of judgment, Drs. Hauptman and Pop-Moody settled with the
Hamiltons, and the Hamiltons non-suited those defendants. (14) The trial court applied
settlement credits and apportioned responsibility, entered judgment against Centocor
based on the fraud claim, and awarded actual and punitive damages and interest, for a
total award of $4,687,461.70 to Patricia and $120,833.71 to Thomas against Centocor. 
The judgment states that in the alternative, the Hamiltons should recover actual damages
under the various other theories presented to the jury. This appeal ensued.

II. Learned Intermediary Doctrine

 Within its first, second, third, and fourth issues, Centocor argues that the "learned
intermediary" doctrine precludes the Hamiltons' recovery because, as a matter of law,
Centocor's warnings to Patricia's physicians were adequate. Centocor argues that it had
no duty to warn Patricia directly. For the reasons explained below, we disagree, and we
recognize an exception to the doctrine when a drug manufacturer engages in direct-to-consumer advertising that fraudulently touts the drug's efficacy while failing to warn of the
risks.

A. Origins of the "Learned Intermediary" Doctrine in Texas

 The "learned intermediary" doctrine in Texas can be traced back to this Court's
opinion in Gravis v. Parke-Davis & Co., 502 S.W.2d 863, 869-71 (Tex. Civ. App.-Corpus
Christi 1973, writ ref'd n.r.e.). In that case, the plaintiff had surgery to correct an intestinal
obstruction. Id. at 864-65. She received a spinal anesthetic for the surgery that was
composed of a combination of three drugs--novocaine, dextrose, and adrenaline--and
pentothal sodium. Id. The novocaine and dextrose were manufactured by Winthrop
Laboratories and Sterling Drug Company; the adrenaline was manufactured by Parke-Davis and Company; and the pentothal sodium was manufactured by Abbott Laboratories. 
Id. at 865. 

 After the surgery, the plaintiff could not move her legs, and she suffered from
bladder dysfunction, phlebitis of the left leg, high blood pressure, and other problems with
her lower extremities. Id. She sued Winthrop Laboratories, Sterling Drug Company, and
Parke-Davis, alleging that they were strictly liable for her injuries. Id. at 864. The trial court
granted summary judgment for the defendants, and we reversed the summary judgment
and remanded for trial. Id. At the conclusion of the case in chief, the drug companies
moved for a directed verdict, which the trial court granted. Id. The plaintiff then appealed
to this Court. Id. 

 A doctor testified at trial that Winthrop Laboratories included a warning in its
package insert for the novocaine. Id. at 866. The package insert, which was directed at
physicians, warned as follows:

 In isolated instances one or several of the following complications or side
effects may be observed during or after spinal anesthesia.

 

 Cauda equina and lumbosacral cord complications (usually consisting of
arachnoiditis and demelinization) [r]esult in loss or impairment of motor and
sensory function of the saddle area (bladder, rectum) and one or both legs.
These complications have occurred after the use of most, if not all, spinal
anesthetics. The loss or impairment of motor function may be permanent,
or partial recovery may slowly occur. Various explanations for such
complications have been advanced, such as hypersensitivity or intolerance
to the anesthetic agent with a resultant myelolytic or neurotoxic effect;
pooling or relatively high concentrations of anesthetic solution around the
cauda equina and spinal cord before diffusion; and accidental injection of
irritating antiseptics or detergents (as when syringes are incompletely
cleansed or when the ampule storage solution enters a cracked ampule). 
Hence, many anesthesiologists prefer to autoclave ampules in order to
destroy bacteria on the exterior before opening.

 

 In an article on the hazards of lumbar puncture[,] Dripps and Vandam
(J.A.M.A. 147:1118, Nov. 17, 1951) pointed out that prolonged and
occasionally permanent sensory or motor abnormalities may result from
direct trauma to nerve roots when the puncture is performed. In some of the
reported cases of neurologic sequelae it was found that the disturbance was
due to preexisting disease of the vertebral column or central nervous system
(for example, cord tumors, malignant metastases, multiple sclerosis).


Id. at 866-67. 

 The package insert further warned:

 CONTRAINDICATIONS AND PRECAUTIONS


 With the exception of infection in or about the lumbar area and certain
serious diseases of the central nervous system or of the lumbar vertebral
column, most anesthesiologists consider the following conditions to be only
relative contraindications. The decision whether or not to use spinal
anesthesia in an individual case depends on the physician's appraisal of the
advantages as opposed to the risk and on his ability to cope with the
complications that may arise.

Id. at 867.

 On appeal, the plaintiff argued that the trial court erred in granting a directed verdict
because the drug companies failed to warn her of a possible injury, even though the
product itself was not defective. Id. at 869. We held that the drug companies have a duty
to warn about dangers and risks associated with the use of their products, but that their
duty can be satisfied by warning physicians, who are "learned intermediaries" between the
drug company and the patient:

 Another question before us is whether the manufacturer was required to
warn Mrs. Gravis of the dangers in the drugs. The brochure accompanying
the ampules of novocaine gave the medical personnel involved detailed
instructions and warnings concerning the handling and administration of the
drug. The warnings were directed to the attending physician. We believe
that it was unreasonable to suppose that a drug manufacturer must go
beyond the physician and give actual warnings to the patient. Once the
physician has been warned, the choice of which drugs to use, and the duty
to explain the risks involved, is his. These drugs were manufactured for
administration only by a physician or other authorized person. Generally
speaking, only a physician would understand the propensities and dangers
involved. The doctor is a learned intermediary between the manufacturer
and the ultimate consumer. If the doctor has been properly warned of the
possible side effects, then we believe it is his duty to convey this warning on
to the patient compatible with such a reasonable disclosure as the law
imposes. See Karp v. Cooley, 349 F. Supp. 827 (S.D. Tex. 1972) and
authorities cited therein. In the Cooley case it was suggested that some
disclosures may so disturb the patient [that] they serve as a hindrance to
needed treatment. See also Hall v. United States, 136 F. Supp. 187 (W.D.
La. 1955).

 

 In this case, the physician, the anesthetist, and the hospital have
settled with the plaintiff in another lawsuit. The question is moot as to
whether the specific doctor or others breached their duty to warn Mrs. Gravis. 
We hold that it is unreasonable to demand that the manufacturer of drugs
specifically warn each and every patient that receives drugs prescribed by
the physician or other authorized persons. The entire system of drug
distribution in America is set up so as to place the responsibility of
distribution and use upon professional people. The laws and regulations
prevent prescription type drugs from being purchased by individuals without
the advice, guidance and consent of licensed physicians and pharmacists. 
These professionals are in the best position to evaluate the warnings put out
by the drug industry. Our holding in no way relieve[s] the drug company in
their duty to warn or to provide a product free of defects.


Id. at 870.


 The Texas Supreme Court first acknowledged the "learned intermediary" doctrine
in Alm v. Aluminum Co. of Am., 717 S.W.2d 588, 591-92 (Tex. 1986). (15) In that case, Alm
was injured when a bottle cap exploded off of a 7-Up bottle, hitting him in the face and
injuring his eye. Id. at 590. Aluminum Company of America ("Alcoa") had manufactured
a bottle-capping machine and sold it to JFW Enterprises ("JFW"), who used the machine
to cap soda bottles. Id. at 589. Alcoa warned JFW that a blow-off could occur if the
closure was improper or the glassware was not to specification, but it did not warn of
personal injuries, and JFW did not warn consumers about the possibility of injuries. Id. at
593. Alm sued Alcoa, and Alcoa argued that it had relied on JFW to warn the ultimate
consumers. Id. at 591. 

 Relying on Gravis and federal case law, the Texas Supreme Court recognized that
in some circumstances, a manufacturer of a product may rely on an intermediary to pass
along a warning to the ultimate consumer: 

 We agree that a manufacturer or supplier may, in certain situations, depend
on an intermediary to communicate a warning to the ultimate user of a
product. However, the mere presence of an intermediary does not excuse
the manufacturer from warning those whom it should reasonably expect to
be endangered by the use of its product. The issue in every case is whether
the original manufacturer has a reasonable assurance that its warning will
reach those endangered by the use of its product. 


 In some situations, courts have recognized that a warning to an
intermediary fulfills a supplier's duty to warn ultimate consumers. For
example, when a drug manufacturer properly warns a prescribing physician
of the dangerous propensities of its product, the manufacturer is excused
from warning each patient who receives the drug. The doctor stands as a
learned intermediary between the manufacturer and the ultimate consumer. 


 Generally, only the doctor could understand the propensities and
dangers involved in the use of a given drug. In this situation, it is reasonable
for the manufacturer to rely on the intermediary to pass on its warnings. 
However, even in these circumstances, when the warning to the intermediary
is inadequate or misleading, the manufacturer remains liable for injuries
sustained by the ultimate user. 

 

Id. at 591-92 (citations omitted).

 As the supreme court explained in Alm, a drug manufacturer has a duty to warn the
ultimate consumers of its products about dangers associated with the products, and the
"learned intermediary" doctrine is merely a means of showing that the drug company
complied with its duty. Wyeth-Ayerst Labs. Co. v. Medrano, 28 S.W.3d 87, 91 (Tex.
App.-Texarkana 2000, no pet.) ("The learned intermediary doctrine states that, in some
situations, a warning to an intermediary fulfills a supplier's duty to warn ultimate
consumers.") (citing Alm, 717 S.W.2d at 591). Thus, to the extent that Centocor argues
that it owed no duty to Patricia, it misconstrues the law. The duty to warn the ultimate
consumer was always there--the only question is whether Centocor can rely on its
adequate warnings to physicians to satisfy that duty when it directly advertises to the
patient in a misleading fashion. 

 To understand the answer to that question, we examine the theoretical
underpinnings of the "learned intermediary" doctrine and its recognized exceptions, as well
as the current landscape of medical treatment and direct-to-consumer advertising, to
determine if the concerns giving rise to the "learned intermediary" doctrine remain
applicable when a drug manufacturer directly markets its products to consumers.

B. The Theoretical Underpinnings of the Doctrine 

 From the case law, we can glean several rationales for applying the "learned
intermediary doctrine. First, courts have held that the choice of which drugs to prescribe
properly belongs to the doctor because prescription drugs are manufactured for
administration only by a physician or other authorized person. Gravis, 502 S.W.2d at 870. 
We held in Gravis that "[t]he entire system of drug distribution in America is set up so as
to place the responsibility of distribution and use upon professional people." Id. Because
only a doctor can prescribe medicine, the argument goes, a doctor should receive the
warning and pass it along to his or her patients. Id.

 Second, Texas courts have held that "only a physician would understand the
propensities and dangers involved." Id.; see Alm, 717 S.W.2d at 592. 

 This special standard for prescription drugs is an understandable exception
to the Restatement's general rule that one who markets goods must warn
foreseeable ultimate users of dangers inherent in his products. Prescription
drugs are likely to be complex medicines, esoteric in formula and varied in
effect. As a medical expert, the prescribing physician can take into account
the propensities of the drug, as well as the susceptibilities of his patient. His
is the task of weighing the benefits of any medication against its potential
dangers. The choice he makes is an informed one, an individualized medical
judgment bottomed on a knowledge of both patient and palliative. 


Medrano, 28 S.W.3d at 91 (quoting Reyes v. Wyeth Labs., 498 F.2d 1264, 1276 (5th Cir.
1974)); see Patrick Cohoon, An Answer to the Question of Why the Time Has Come to
Abrogate the Learned Intermediary Rule in the Case of Direct-to-Consumer Advertising of
Prescription Drugs, 42 S. Tex. L. Rev. 1333, 1336 (2001). 

 Third, courts around the country have been reluctant to interfere with the physician-patient relationship by requiring a direct warning from the manufacturer to the patient
because warnings that contradict the advice given by a physician may undermine the
patient's confidence in the physician. See Lars Noah, This is Your Products Liability
Restatement On Drugs, 74 Brook. L. Rev. 839, 891 (2009); Cohoon, 42 S. Tex. L. Rev. at
1336. This Court recognized in Gravis that some disclosures may so disturb patients that
they may hinder needed treatment. Gravis, 502 S.W.2d at 870.

 Fourth, it has been assumed that doctors are in a better position to warn their
patients than the drug manufacturers, who typically do not have effective means to
communicate with the patients. Noah, 74 Brook. L. Rev. at 891-92; Cohoon, 42 S. Tex.
L. Rev. at 1336. "Finally, because of the complexity of risk information about prescription
drugs, comprehension problems would complicate any effort by manufacturers to translate
physician labeling for lay patients." Noah, 74 Brook. L. Rev. at 892; see Cohoon, 42 S.
Tex. L. Rev. at 1336-37. 

C. Recognized Exceptions and the Restatement (Third) of Torts: Products
Liability


 Over the years, various courts have recognized exceptions to the learned
intermediary doctrine in certain settings, where the above premises underlying the doctrine
did not apply. For example, as early as 1968, the Ninth Circuit held that the manufacturer
of a polio vaccine retained a duty to warn the ultimate consumer because in the mass
immunization clinics where the vaccine was administered, a physician was not present to
weigh the risks and benefits of the drug for each patient. See Davis v. Wyeth Labs., Inc.,
399 F.2d 121, 131 (9th Cir. 1968); see also Reyes, 498 F.2d at 1276-78; cf. Hurley v.
Lederle Labs. Div. of Am. Cyanamid, Inc., 863 F.2d 1173, 1178-79 (5th Cir. 1984) (holding
learned intermediary theory applied in case involving DPT vaccine, which was prescribed
and administered under supervision of physician). (16) 

 Additionally, several courts have recognized an exception to the "learned
intermediary" doctrine in oral contraceptives cases. These cases reason that: (1) patients
take contraceptives as a matter of choice; (2) patients personally select their
contraceptives; (3) physicians play a reduced role in the decision-making process; and (4)
often, these drugs are marketed directly to consumers without communicating the harmful
side effects in a meaningful way. See, e.g., Odgers v. Ortho Pharms. Corp., 609 F. Supp.
867, 872 (E.D. Mich. 1985); Stephens v. G.D. Searle & Co., 602 F. Supp. 379, 382 (E.D.
Mich. 1985); MacDonald v. Ortho Pharms. Corp., 475 N.E.2d 65, 74 (Mass. 1985); see
also Cohoon, 42 S. Tex. L. Rev. at 1337-38.

 In other words, in situations where an exception to the "learned intermediary"
doctrine has been recognized, courts have focused on (1) the extent to which the doctor
is involved in the decision-making process and the selection of the drug itself; and (2)
whether there is a reasonable likelihood that warnings will be adequately conveyed to the
patient. The American Law Institute recognized this trend in the case law when it adopted
section 6(d) of the Restatement (Third) of Torts: Products Liability:

 (d) A prescription drug or medical device is not reasonably safe due to
inadequate instructions or warnings if reasonable instructions or
warnings regarding foreseeable risks of harm are not provided to:


 (1) prescribing and other health-care providers who are in a
position to reduce the risks of harm in accordance with the
instructions or warnings; or


 (2) the patient when the manufacturer knows or has reason to
know that health-care providers will not be in a position to
reduce the risks of harm in accordance with the instructions or
warnings.


Restatement (Third) of Torts: Products Liability § 6(d) (1997) (emphasis added). 


 As the comments explain, section 6(d)(1) reflects the traditional "learned
intermediary" doctrine, while section 6(d)(2) recognizes that drug manufacturers retain a
duty to warn the consumer when the physician's role in evaluating and making a decision
as to the choice of drug is diminished: 

 The obligation of a manufacturer to warn about risks attendant to the
use of drugs and medical devices that may be sold only pursuant to a
health-care provider's prescription traditionally has required warnings
directed to health-care providers and not to patients. The rationale
supporting this "learned intermediary" rule is that only health-care
professionals are in a position to understand the significance of the risks
involved and to assess the relative advantages and disadvantages of a given
form of prescription-based therapy. The duty then devolves on the
health-care provider to supply to the patient such information as is deemed
appropriate under the circumstances so that the patient can make an
informed choice as to therapy. Subsection (d)(1) retains the "learned
intermediary" rule. However, in certain limited therapeutic relationships the
physician or other health-care provider has a much-diminished role as an
evaluator or decisionmaker. In these instances it may be appropriate to
impose on the manufacturer the duty to warn the patient directly. 


Id. cmt. b. The comments further recognize the exceptions to the "learned intermediary"
doctrine that have developed in the case law:

 Warnings and instructions with regard to drugs or medical devices that can
be sold legally only pursuant to a prescription are, under the "learned
intermediary" rule, directed to health-care providers. Subsection (d)(2)
recognizes that direct warnings and instructions to patients are warranted for
drugs that are dispensed or administered to patients without the personal
intervention or evaluation of a health-care provider. An example is the
administration of a vaccine in clinics where mass inoculations are performed. 
In many such programs, health-care providers are not in a position to
evaluate the risks attendant upon use of the drug or device or to relate them
to patients. When a manufacturer supplies prescription drugs for distribution
to patients in this type of unsupervised environment, if a direct warning to
patients is feasible and can be effective, the law requires measures to that
effect.


Id. cmt. e.


 Comment e to section 6 further explains that the American Law Institute recognized
the argument that when a drug manufacturer directly advertises to consumers, it has a duty
to warn the consumer of dangers inherent in the drug's use. Id. The Institute, however,
determined it best to leave the issue to the developing case law:

 Although the learned intermediary rule is generally accepted and a drug
manufacturer fulfills its legal obligation to warn by providing adequate
warnings to the health-care provider, arguments have been advanced that
in two other areas courts should consider imposing tort liability on drug
manufacturers that fail to provide direct warnings to consumers. In the first,
governmental regulatory agencies have mandated that patients be informed
of risks attendant to the use of a drug. A noted example is the FDA
requirement that birth control pills be sold to patients accompanied by a
patient package insert. In the second, manufacturers have advertised a
prescription drug and its indicated use in the mass media. Governmental
regulations require that, when drugs are so advertised, they must be
accompanied by appropriate information concerning risk so as to provide
balanced advertising. The question in both instances is whether adequate
warnings to the appropriate health-care provider should insulate the
manufacturer from tort liability.

 

 Those who assert the need for adequate warnings directly to consumers
contend that manufacturers that communicate directly with consumers
should not escape liability simply because the decision to prescribe the drug
was made by the health-care provider. Proponents of the learned
intermediary rule argue that, notwithstanding direct communications to the
consumer, drugs cannot be dispensed unless a health-care provider makes
an individualized decision that a drug is appropriate for a particular patient,
and that it is for the health-care provider to decide which risks are relevant
to the particular patient. The Institute leaves to developing case law
whether exceptions to the learned intermediary rule in these or other
situations should be recognized.


Id. (17) Thus, the Institute refused to take a position on direct-marketing claims and has left
it up to courts, such as ours, to resolve the issue, which we do next. 

D. Changes in Pharmaceutical Advertising and the Provision of Healthcare


 When the "learned intermediary" doctrine was first developed, drug manufacturers
did not advertise to the general public. State ex. Rel. Johnson & Johnson Co. v. Karl, 647
S.E.2d 899, 907 (W. Va. 2007) (citing Francis B. Palumbo & C. Daniel Mullins, The
Development of Direct-to-Consumer Prescription Drug Advertising Regulation, 57 Food &
Drug L.J. 422, 424 (2002); Ozlem A. Bordes, The Learned Intermediary Doctrine and
Direct-to-Consumer Advertising: Should the Pharmaceutical Manufacturer Be Shielded
from Liability, 81 U. Det. Mercy L. Rev. 267, 274-75 (Spring 2004)). "Significant changes
in the drug industry have post-dated the adoption of the learned intermediary doctrine in
the majority of states in which it is followed." Id. In particular, those changes have
included "the initiation and intense proliferation of direct-to-consumer advertising, along
with its impact on the physician/patient relationship . . . ." Id. 

 The first drug manufacturer to advertise directly to consumers was Upjohn
Company, when it advertised for the men's hair-loss treatment, Rogaine. See Jon D.
Hanson & Douglas A. Kysar, Taking Behavioralism Seriously: Some Evidence of Market
Manipulation, 112 Harv. L. Rev. 1420, 1456 (1999). Upjohn's advertisement asked the
question, "Can an emerging bald spot . . . damage your ability to get along with others,
influence your chance of obtaining a job or date or even interfere with your job
performance?" Id. "Another ad featured an attractive female stating unequivocally, 'I know
that a man who can afford Rogaine is a man who can afford me.'" Id. 

 Commentators have noted that since the first direct-to-consumer advertisement in
the 1980s, "'almost all pharmaceutical companies have engaged in this direct marketing
practice.'" Id. (quoting Barbara J. Tyler & Robert A. Cooper, Blinded by the Hype: Shifting
the Burden When Manufacturers Engage in Direct to Consumer Advertising of Prescription
Drugs, 21 Vt. L. Rev. 1073, 1096 (1997)). In fact, "from 1995 to 1996, drug companies
increased advertising directed to consumers by ninety percent." Perez, 734 A.2d at 1251. 
By 1997, annual "advertising costs of pharmaceutical products surpassed the half-billion
dollar mark for the first time, 'easily outpacing promotional efforts directed to physicians.'"
Id. (quoting Lars Noah, Advertising Prescription Drugs to Consumers: Assessing the
Regulatory and Liability Issues, 32 Ga. L. Rev. 141, 141 (1997)). And in 2001,
pharmaceutical companies spent $2.38 billion on direct-to-consumer marketing. Palumbo
& Mullins, 57 Food & Drug L.J. at 423. 

 One need only turn on the television to see the effects. See Bordes, 81 U. Det.
Mercy L. Rev. at 275. "Anyone who watches television is regularly bombarded with a
variety of pharmaceutical products which suggest that the ultimate consumer ask his
physician to prescribe a particular advertised product." Larkin v. Pfizer, Inc., 153 S.W.3d
758, 771 (Ky. 2004) (Winterscheimer, J., dissenting). It is no wonder that pharmaceutical
companies have expanded their advertising because, according to estimates, consumers
now spend more than $1 trillion on health-care products and services per year, with roughly
$70 billion being spent on prescription drugs. Cohoon, 42 S. Tex. L. Rev. at 1353. And as
more advertising is directed at consumers, those expenditures increase. See Perez, 734
A.2d at 1252.

 Alongside the increase in direct marketing, the practice of medicine has dramatically
changed. Although a doctor still must write a prescription for prescription drugs, "[i]nformed
consent now requires a patient-based decision rather than the paternalistic approach of
the 1970s." Id. at 1255; see also Karl, 647 S.E.2d at 910. Physicians no longer make the
final decision as to whether a patient will take a drug--patients make those decisions. See
Teresa Moran Schwartz, Consumer-Directed Prescription Drug Advertising and the
Learned Intermediary Rule, 46 Food Drug Cosm. L.J. 829, 831 (1991). Moreover, the time
doctors spend with their patients, and thus the time spent in a serious discussion of the
risks of pharmaceuticals, has changed--managed care has reduced the time allotted per
patient to ten- or fifteen-minute appointments, and now patients spend more time in waiting
rooms than they do with their doctor. See Perez, 734 A.2d at 1255. "'In a 1997 survey of
1,000 patients, the F.D.A. found that only one-third had received information from their
doctors about the dangerous side effects of drugs they were taking.'" Id. (quoting Sheryl
Gay Stolberg, Faulty Warning Labels Add to Risk in Prescription Drugs, N.Y. Times, June
4, 1999, at A27). 

 The impact of advertising on the physician-patient relationship has been dramatic. 
In 1982, the FDA formally requested a moratorium on direct advertising in order to allow
it to study the issue. Palumbo & Mullins, 57 Food & Drug L.J. at 424. The FDA studies
revealed that consumers who viewed advertising for prescription drugs typically "retained
more information about the benefits of the products than the risks." Id. (citing Louis A.
Morris & Lloyd G. Millstein, Drug Advertising to Consumers: Effects of Formats for
Magazine and Television Advertisements, 39 Food & Drug L.J. 497 (1984)). The FDA also
found that "consumers wanted more information about prescription drugs and would view
direct-to-consumer advertising favorably." Id. (citing Louis A. Morris, David Brinberg & Ron
Klimberg et al., The Attitudes of Consumers Toward Direct Advertising of Prescription
Drugs, 101 Pub. Health Rep. 82 (1986)). 

 After years of patients being subjected to direct advertising, 

 physicians state that they are increasingly asked and pressured by their
patients to prescribe drugs that the patient has seen advertised. For
example, the diet drug combinations known as fen-phen was prescribed
despite little hard scientific evidence of its potential side effects. Physicians
are under attack for prescribing pills too often and too readily to inappropriate
patients. Physicians argue it is not their fault; rather, they claim pushy
patients, prodded by [direct-to-consumer] advertisements, pressed,
wheedled, begged and berated them for quick treatments . . . . Physicians
claim that it is impossible to compete with pharmaceutical companies'
massive advertising budgets, and resign themselves to the fact that if
consumers make enough noise, they will eventually relent to patient
pressure.


Tamar V. Terzian, Note, Direct-to-Consumer Prescription Drug Advertising, 25 Am. J. L. &
Med. 149, 157-58 (1999).

E. The Theoretical Underpinnings of the Doctrine Do Not Apply When a
Manufacturer Directly Markets to the Patient


 The changes in the delivery of healthcare brought about by direct marketing and
managed care demonstrate that the theoretical underpinnings of the "learned intermediary"
doctrine do not apply when a drug manufacturer directly markets to its consumers, the
patients. First, although a doctor must still write a prescription for prescription drugs, it is
clear that many doctors are not spending the amount of time necessary to pass along
warnings by pharmaceutical companies. See Perez, 734 A.2d at 1255. The problem this
creates is compounded by the fact that patients now make the ultimate decisions regarding
the drugs they will take and often ask for drugs by name. Id. Second, drug manufacturers
who directly market their products to consumers are hard-pressed to argue that only a
physician would understand the propensities and dangers involved and that they lack
effective means to communicate directly with consumers. In fact, by directly marketing to
consumers and providing warnings in those advertisements, drug manufacturers have
completely undermined their own arguments. See id. at 1256. Third, and similarly, "it is
illogical that requiring manufacturers to provide direct warnings to a consumer will
undermine the patient-physician relationship, when, by its very nature, consumer-directed
advertising encroaches on that relationship by encouraging consumers to ask for
advertised products by name." Id. (quoting Susan A. Casey, Comment, Laying an Old
Doctrine to Rest: Challenging the Wisdom of the Learned Intermediary Doctrine, 19 Wm.
Mitchell L. Rev. 931, 956 (1993) (footnotes omitted)). In sum, the premises underlying
the doctrine are unpersuasive when considered in light of direct marketing to patients. Id. 
The situation presented is more similar to the recognized exceptions to the doctrine, where
courts considering the issue have found it was unreasonable for a manufacturer to rely on
an intermediary to convey a warning, given that direct advertising and changes in the
provision of healthcare impact the doctor's role and promote more active involvement by
the patient. See supra Part II.C. Under these circumstances, we hold that when a
pharmaceutical company directly markets to a patient, it must do so without fraudulently
misrepresenting the risks associated with its product. Accordingly, we overrule Centocor's
first, second, third, and fourth issues to the extent those issues rely on the learned
intermediary doctrine. (18) 

III. Evidence of Causation

 By its second and fourth issues, Centocor argues that the judgment should be
reversed because Patricia failed to present legally and factually sufficient evidence that (1)
Remicade caused the injuries she allegedly suffered, and (2) different warnings by
Centocor would have prevented those injuries. 

A. Standard of Review

 When conducting a legal sufficiency review, we view the evidence in the light most
favorable to the verdict to determine whether the evidence at trial would allow reasonable
and fair-minded people to reach the verdict under review. City of Keller v. Wilson, 168
S.W.3d 802, 827 (Tex. 2005). We "must credit favorable evidence if reasonable jurors
could, and disregard contrary evidence unless reasonable jurors could not." Id. We will
sustain a challenge to the legal sufficiency of evidence only if: (1) there is a complete
absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence
from giving weight to the only evidence offered to prove a vital fact; (3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes
conclusively the opposite of a vital fact. Id. at 810. More than a scintilla of evidence exists,
and the evidence is legally sufficient, if the evidence furnishes some reasonable basis for
differing conclusions by reasonable minds about a vital fact's existence. Lee Lewis Constr.
Co. v. Harrison, 70 S.W.3d 778, 782-83 (Tex. 2001). However, "when the evidence offered
to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion
of its existence, the evidence is no more than a scintilla and, in legal effect, is no
evidence." Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (citing Kindred
v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)).

 In conducting a factual sufficiency review, we do not substitute our judgment for that
of the jury; rather, we view all the evidence in a neutral light to determine whether the
evidence is so weak or the finding is so contrary to the great weight and preponderance
of the evidence as to be manifestly unjust, shock the conscience, or clearly demonstrate
bias. See City of Keller, 168 S.W.3d at 826; Golden Eagle Archery, Inc. v. Jackson, 116
S.W.3d 757, 761 (Tex. 2003); Pool v. Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986);
Villagomez v. Rockwood Specialties, Inc., 210 S.W.3d 720, 749 (Tex. App.-Corpus Christi
2006, pet. denied).

B. Remicade as the Cause of Patricia's Symptoms

 Centocor contends that there was no evidence, direct or otherwise, that the drug
Remicade caused Patricia's injuries. Specifically, Centocor argues that Patricia did not
present any evidence of causation by introducing epidemiological studies showing that
Remicade increased the risks of her alleged injuries. Additionally, Centocor argues that
"[n]o competent witness testified that taking Remicade caused Hamilton's alleged injuries;
instead, the jury was left to make that conclusion based on the timing of events" because
the evidence showed only that (1) Patricia took Remicade, and (2) some time after taking
Remicade, she suffered various injuries. 

 Before we address the merits of these arguments, we note that Centocor did not
raise these arguments in its motions for directed verdict, objections to the jury charge, or
motions for judgment notwithstanding the verdict. Rather, Centocor first raised these
challenges to the causation evidence in its motion for new trial. Thus, even if we agree
with Centocor that there is no legally sufficient evidence of causation on this ground, we
may only grant Centocor a new trial. See Werner v. Colwell, 909 S.W.2d 866, 870 n.1
(Tex. 1995). 

 Centocor argues that Patricia did not present epidemiological studies to prove that
Remicade can cause lupus-like syndrome in the general population in order to show
general causation. See Merrill Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 714 (Tex.
1998) (addressing use of epidemiological studies as evidence of causation). It is true that
Patricia did not present epidemiological studies to prove general causation. Centocor,
however, does not address on appeal evidence showing general causation, some of which
Centocor itself presented at trial. Medina v. Hart, 240 S.W.3d 16, 22-24 (Tex.
App.-Corpus Christi 2007, pet. denied) (holding that while expert testimony was usually
required to establish negligence and causation, testimony admitted by defendant, which
defendant did not address on appeal, could support the verdict). 

 For example, first, the package insert issued by Centocor and approved by the FDA
acknowledges that lupus-like syndrome is a risk associated with taking Remicade. The
package insert itself described findings from Centocor's clinical trials prior to FDA approval
that found that some patients may rarely suffer from lupus-like syndrome as a result of
Remicade. Centocor's witness, Dr. Matthews, testified that if a risk associated with a
drug's treatment is included on the package insert, that risk is "reasonably associated" with
the treatment. 

 Second, Patricia's doctors repeatedly testified that they knew of the risks of
Remicade treatment--specifically, the risk of lupus-like syndrome. In fact, Centocor
argued as much in its brief: "In this case, the undisputed evidence at trial proved that
Hamilton's doctors knew about the risks of Remicade treatment, particularly of lupus-like
syndrome." Brief of Appellant at 14. For example, when asked what Dr. Bullen knew
about lupus, he answered, "Well, I knew [Remicade] caused a lupus-like illness. It's very
rare, but it caused a lupus-like problem, not lupus." Dr. Hauptman testified that the "rare
side effect of lupus was brought up with Mrs. Hamilton," and he explained that he got the
notion that the side effect was rare from the package insert and also from literature
published by doctors who were sponsored by Centocor. More importantly, however, Centocor itself put on expert testimony that
demonstrated that Remicade could cause lupus-like syndrome. Centocor read Dr. Trock's
deposition into the record. Dr. Trock testified that in the general population, "about one out
of every 400 women of child-bearing age may get concurrent lupus" along with their
Crohn's disease. That converts to a percentage of 0.25% of the population. Later in the
testimony, Dr. Trock testified that in recent trials, the number of patients treated with
Remicade who developed lupus-like syndrome went "up to two or three per 100," which
converts to a percentage of 2% or 3%. Next, Centocor read the deposition of Herbert
Bonkovsky., M.D. He testified that lupus is a "rare but recognized complication of the
administration of [Remicade] . . . ." Centocor itself put on this testimony, and it does not
point to any contrary evidence in the record. See Havner, 953 S.W.2d at 717. Centocor
has not explained why this evidence could not have supported the jury's verdict, and we
now hold that it is both legally and factually sufficient to support the verdict. See Medina,
240 S.W.3d at 22-24. 

 Centocor next argues that Patricia did not put on evidence of specific causation,
proving that Remicade caused her drug-induced lupus-like syndrome. It concedes that
"[e]vidence of an event followed closely by manifestation of or treatment for conditions
which did not appear before the event raises suspicion that the event at issue caused the
conditions." Guevara v. Ferrer, 247 S.W.3d 662, 668 (Tex. 2007). Centocor argues,
however, that "suspicion has not been and is not legally sufficient to support a finding of
legal causation." Id. Centocor argues that besides sequence-of-events evidence, Patricia
did not present any evidence that Remicade caused her injuries; thus, Patricia did not
prove specific causation. To reach this conclusion, again, Centocor ignores most of the
evidence in the record, including evidence from its own experts. 

 First, Dr. Ertan was an expert witness for Centocor. He testified that he was the
principal investigator for Centocor when it tested Remicade's efficacy in treating Crohn's
disease and that he agreed with Patricia's doctors in Houston that Patricia developed drug-induced lupus-like syndrome. Second, Centocor's other expert witness, Dr. Olsen, testified
that she diagnosed Patricia with drug-induced lupus-like syndrome caused by her
Remicade treatment. Finally, Dr. Trock testified that he diagnosed Patricia with drug-induced lupus-like syndrome caused by her Remicade treatment. Centocor does not point
to any contrary evidence in the record. Centocor does not discuss this evidence, which we
hold is legally and factually sufficient to support the verdict. See Medina, 240 S.W.3d at
22-24. 

C. Inadequate Warning as a Cause of Patricia's Injuries

 Finally, Centocor argues that there is no evidence that a different warning by
Centocor would have prevented Patricia's injuries and that the allegedly fraudulent
statements in the video did not cause Patricia to take Remicade because she watched the
video after Dr. Hauptman prescribed Remicade while she was receiving a Remicade
infusion. Centocor further argues that there is no evidence that Patricia would have acted
differently had a different warning been provided because even after Patricia became
aware of the risk of lupus-like syndrome, which it argues occurred when Dr. Pop-Moody
discussed lupus with her in the spring of 2003, Patricia continued to receive Remicade
infusions. However, once again, Centocor does not address all the evidence in the record
that could have supported the jury's verdict. 

 Patricia denied that Dr. Pop-Moody told her that Remicade could be causing her
lupus-like syndrome, and Dr. Pop-Moody's notes indicate that she told her only that
"[p]ositive serology for lupus is not unusual with the Remicade but developing symptoms
of lupus would indicate that the patient has the condition and then the Remicade infusions
won't be so helpful." Thus, it is not clear, as Centocor seems to argue, that in the spring
of 2003, Patricia was aware that additional infusions might worsen her problems.

 To the contrary, Dr. Pop-Moody's notes and Patricia's testimony indicated that at
that time, she did not want to stop treatment with Remicade because she believed it was
the only thing giving her relief from her symptoms. And the evidence showed that, albeit
for a short amount of time after each infusion, Patricia did have some relief from her
symptoms. Patricia testified that after watching the Centocor video, she did not believe she
had to do any further research or ask any more questions, and she also testified that had
she been warned of lupus-like syndrome, she would have asked more questions. It is also
reasonable to assume that, had Patricia been adequately warned, she would not have
been under the impression that Remicade was the instrument of her relief from her joint
pain. Centocor does not address this testimony or explain why it did not support the
verdict. 

 Furthermore, the fact that Patricia watched the video after Dr. Hauptman first
prescribed Remicade does not necessarily undermine a finding of causation. The
evidence at trial showed that Dr. Hauptman prescribed an induction series of three
infusions of Remicade over a six-week period. Patricia denied that Dr. Hauptman
discussed lupus-like syndrome with her at the time he prescribed the Remicade. Patricia
saw the video during her first infusion prescribed by Dr. Hauptman. She testified that after
watching the video, she "felt very good about Remicade treatment." She explained, "I
thought it was going to change my life and make me feel great like all the people in the
video." 

 The facts of this case show that at the time Dr. Hauptman prescribed the Remicade,
Patricia believed she would only need three infusions. However, after those first three
infusions she began experiencing severe joint pain, and she visited Dr. Pop-Moody, who
advised that Patricia continue the Remicade infusions indefinitely. Thus, Patricia was
again required to make a decision as to whether to take Remicade infusions after watching
the video. She testified that she did not have any concerns about taking additional
infusions after watching the video, which convinced her that she did not need to do any
additional research. Once again, Centocor does not address why this evidence does not
support the judgment, and we believe this evidence was legally and factually sufficient to
demonstrate causation. See Medina, 240 S.W.3d at 22-24; see, e.g., Merck & Co., Inc.
v. Garza, 277 S.W.3d 430, 438 (Tex. App.-San Antonio 2008, pet. granted) (holding that
where a doctor continued prescription of drug prescribed by prior doctor, and enlarged
time period of prescription, the relevant issue was whether adequate warning would have
prevented second prescription).

 In sum, we overrule Centocor's second and fourth issues because we hold that the
evidence, most of which Centocor completely ignores, is legally and factually sufficient to
support the finding of causation. See Medina, 240 S.W.3d at 22-24. 

IV. Adequacy of the Warning

 By its third issue, Centocor argues that its warning was adequate. First, Centocor
asserts that Patricia failed to present legally and factually sufficient evidence that the
warnings were inadequate because no expert testified that the Remicade warnings were
inadequate. Second, Centocor argues that the risk of lupus-like syndrome did not make
Remicade unreasonably dangerous. We disagree.

A. Expert Testimony

 First, Centocor argues that it "unquestionably" provided warnings to Patricia,
including a package insert and a videotape, and that Patricia was required to prove that
these warnings were inadequate. Centocor, however, ignores significant testimony from
its own expert witness, Dr. Matthews, that satisfied this requirement.

 Testimony from Dr. Matthews, Centocor's expert, confirms that the complete
absence of a warning in the video regarding lupus-like syndrome failed to satisfy
Centocor's duty to warn a patient directly of known side effects. Dr. Matthews testified at
length about what information must be included in advertisements by pharmaceutical
companies. Patricia introduced a copy of chapter 21 of the Code of Federal Regulations,
section 202.1, which governs advertisements by drug companies. See 21 C.F.R. § 202.1
(2002). Dr. Matthews explained that this regulation would apply to the video produced by
Centocor and shown to Patricia at the infusion clinic. 

 Dr. Matthews testified that advertisements for drugs, including the Centocor video,
are required to include "fair balance" information, and she referred to 21 C.F.R. section
202.1(e)(3)(i) and (iii), which provides:

 (3) Scope of information to be included; applicability to the entire
advertisement. (i) The requirement of a true statement of information relating
to side effects, contraindications, and effectiveness applies to the entire
advertisement. Untrue or misleading information in any part of the
advertisement will not be corrected by the inclusion in another distinct part
of the advertisement a brief statement containing true information relating to
side effects, contraindications, and effectiveness of the drug. If any part or
theme of the advertisement would make the advertisement false or
misleading by reason of the omission of appropriate qualification or pertinent
information, that part or theme shall include the appropriate qualification or
pertinent information, which may be concise if it is supplemented by a
prominent reference on each page to the presence and location elsewhere
in the advertisement of a more complete discussion of such qualification or
information.


 . . . .


 (iii) The information relating to side effects and contraindications shall
disclose each specific side effect and contraindications (which include side
effects, warnings, precautions, and contraindications and include any such
information under such headings as cautions, special considerations,
important notes, etc; see paragraph (e)(1) of this section) contained in the
required, approved, or permitted labeling for the advertised drug dosage
form(s); . . . .

 

Id. § 202.1(e)(3)(i), (iii) (emphasis added). 

 Dr. Matthews stated that an advertisement must include true information regarding
"side effects, warnings, precautions, contraindications, and includes any such information
under such headings as cautions, special considerations, important notes, and so forth,
and effectiveness." Dr. Matthews then admitted that an advertisement is not a true
statement if "it is false or misleading with respect to side effects, contraindications, or
effectiveness." She agreed that an advertisement is also misleading if it "fails to present
a fair balance between information relating to side effects and contraindications and
information related to effectiveness of the drug." (Emphasis added). Dr. Matthews
testified, however, that an advertisement is not misleading if the "presentation of true
information relating to side effects and contraindications is comparable in depth and detail
with the claims for effectiveness and safety." 

 Most importantly, with respect to side effects, Dr. Matthews explained that
advertisements must include information that is "consistent with what's in the labeling, the
package insert." Dr. Matthews agreed that the intent of the regulations of drug advertising
was not to require patients to read package inserts, which she referred to as the "labeling"
instead of advertising. However, she clarified that the package insert interrelates with drug
advertising because "it has to be what's in the label." 

 Dr. Matthews then testified that she believed that the video was not misleading, and
included "fair balance" information, because the "theme" of the video was the infusion
process. She disagreed that the video showed more information about Remicade's
effectiveness than warnings about the drug. Dr. Matthews agreed that there was no
warning about lupus-like syndrome, but she claimed that the video was fairly balanced
because it "said to also ask your physician and then to reference the package insert, which
I was under the impression when you saw the video you were given a little card and then
also the package insert."

 It was undisputed that the video itself did not provide a warning about lupus-like
syndrome. And Patricia testified that the package insert was not included with the video
she watched. The box containing the video did not have a plastic sleeve to hold a package
insert, as did a later video produced by Centocor. Centocor does not address this
evidence, which allowed the jury to conclude that Patricia received no warning about lupus-like syndrome from the video it directly marketed to her or from any accompanying
documentation.

 In this case, we hold that Dr. Matthews's testimony, put on by Centocor, satisfied
the requirement of expert testimony on how to judge the adequacy of the warning, and the
only issue left for the jury to decide was whether the facts were as Centocor's expert
assumed them to be. For example, in Medina v. Hart, a medical malpractice case, Hart
sued his doctor, Dr. Medina, after he received second and third-degree burns during a
surgery to remove a kidney stone. 240 S.W.3d at 18-19. Dr. Medina had placed an IV bag
filled with fluid under Hart's right arm to position and cushion Hart during the surgery. Id.
at 18. When Hart awoke from surgery, he had burns under his right arm where the IV bag
had been placed. Id. at 19.

 Dr. Medina testified at trial. She admitted that it was her duty to ensure that her
patient would not be injured during surgery, which included the duty to properly position the
patient for surgery. Id. at 20. She admitted that it would be a breach of the standard of
care to place a hot IV bag under a patient's arm during surgery. Id. She also admitted that
somehow the IV bag she placed under Hart's arm became heated and caused Hart's
burns. Id. The main dispute at trial, therefore, was over how the bag became heated. Id.
at 21. Dr. Medina testified that the bag was not hot when she placed it under Hart's arm,
but Hart's wife testified that a nurse told her that the bag had been heated and wrapped
in a towel prior to being placed under Hart's arm. Id. Hart's wife testified that a nurse told
her about a conversation she had with Dr. Medina during which Dr. Medina became
agitated after the nurse questioned whether the bag had been heated. Id. Dr. Medina's
assistant then stated, "I wish some people would just simply tell the truth." Id.

 On appeal, Dr. Medina argued that there was no expert testimony on standard of
care, breach, and causation. Id. at 22. We held that Dr. Medina had judicially admitted
negligence and causation by stating that placing a heated bag under a patient's arm would
be negligent and could cause a burn like Hart's. Id. at 24. We further held that the only
issue in dispute was one of fact which was for the jury to decide--how and when the bag
became hot. Id.

 In this case, Dr. Matthews, Centocor's expert, testified that a warning in an
advertisement must include the information in the package insert. She testified that she
believed that the warnings in the video were adequate because she assumed that a patient
watching the Centocor video would also receive the package insert, which would provide
the complete warning. In contrast to this, the jury also heard testimony from Patricia
stating that the package insert was not included along with the video. See Burroughs
Wellcome Co. v. Crye, 907 S.W.2d 497, 499-500 (Tex. 1995) (holding expert's conclusion
could be disregarded when based on assumed facts not supported by testimony at trial). 
The jury was entitled to rely on Dr. Matthews's opinion that an adequate warning must
include the information in the package insert, and resolve the fact issue of whether or not
the video included such information. It resolved that issue in Patricia's favor. Id. We
overrule Centocor's issue in this regard. 

B. Unavoidably Unsafe Product

 Next, Centocor argues that Patricia failed to prove that the warnings made
Remicade defective by rendering it unreasonably dangerous. Centocor argues that the
undisputed evidence showed that drug-induced lupus-like syndrome was not dangerous
because the symptoms are not "severe," in the sense that Patricia required hospitalization,
and because discontinuing the Remicade treatment eliminated the symptoms. In addition,
Centocor argues that Remicade "worked" by putting Patricia's Crohn's disease into
remission and temporarily gave Patricia relief from her arthritis. Centocor acknowledges
that Patricia suffered pain between infusions, but it urges the Court to hold "as a matter of
law" that temporary pain is not the type of danger that makes a prescription drug defective,
citing section 402A of the Restatement of Torts (Second). (19) 

 First, we note that again, Centocor ignores much of the record to make its
conclusions. Patricia's symptoms, while temporary, were certainly severe. Patricia could
not dress herself because her shoulders were so painful. She also testified that she was
afraid to drive her car because she was afraid that her pain would prevent her from
operating it safely. Patricia's husband, Thomas, testified that she could no longer perform
her daily functions, including caring for her colostomy. This pain, while temporarily relieved
by the Remicade infusions, persisted from March of 2001 until October of 2003, when she
was weaned off Remicade. And Centocor's argument that Patricia never had to be
hospitalized is not supported by the record--Patricia was hospitalized when she suffered
from pericarditis, which was a symptom of her lupus-like syndrome. 

 Nevertheless, assuming without deciding that Patricia had to prove that Remicade
was unreasonably dangerous to recover on her fraud claim, Centocor does not cite any
case law in support of its argument that a drug must cause a permanent side effect in order
to be unreasonably dangerous as marketed, and we refuse to hold as much. Centocor
argues that some products "cannot possibly be made entirely safe for all consumption, and
any food or drug necessarily involves some risk of harm, if only from over-consumption." 
Restatement (Second) of Torts § 402A cmt. i (1965). Centocor further argues that there
are some products which are "quite incapable of being made safe for their intended and
ordinary use. . . .  Such a product, properly prepared, and accompanied by proper
directions and warning, is not defective, nor is it unreasonably dangerous." Id. cmt. k. 

 Centocor relies on this language to argue that it has no liability because Remicade
could not possibly be made entirely safe. The argument then progresses to Centocor's
conclusion that it may sell a product that is dangerous even without an adequate warning,
merely because the dangerous consequences are only temporary. But Centocor ignores
the Restatement's solution to an unavoidably unsafe product--provide an adequate
warning. Id. ("The seller of such products, again with the qualification that they are
properly prepared and marketed, and proper warning is given, where the situation calls for
it, is not to be held to strict liability for unfortunate consequences attending their use,
merely because he has undertaken to supply the public with an apparently useful and
desirable product, attended with a known but apparently reasonable risk."). Comment k
to section 402A may provide a defense to a design defect claim, but it certainly does not
absolve a manufacturer of its liability for completely failing to warn of a dangerous side
effect. See Carla P. Herron & Kelli L. Degeeter, Can Texas Escape the Unavoidably
Unsafe Medicine of Comment k by Adopting Section 8 of the Proposed Third Restatement
of Torts?, 49 Baylor L. Rev. 73, 78 (1997) ("Thus, once comment k is applied, all
questions of a product's design become irrelevant and the focus shifts to the adequacy, or
reasonableness, of the warning of the product's risks."). Accordingly, we overrule
Centocor's third issue. 

V. Evidence of Fraudulent Intent (20)

 Within its fourth issue, Centocor argues that there is no evidence that it intended
that Patricia rely on a material omission. Specifically, there is no evidence that Centocor
intended for Patricia to take Remicade without adequate knowledge of the possible side
effects. It asserts that the video directed patients to contact their physicians about possible
side effects and contained the package insert that disclosed all of the associated side
effects. Centocor further argues that, because the jury's finding of punitive damages was
predicated on the fraud finding, the punitive damages award must be reversed. We
disagree.

 A misleading partial disclosure of information is actionable if it is made with the
intent to induce action by another. Sears, Roebuck & Co. v. Meadows, 877 S.W.2d 281,
282 (Tex. 1994); see Columbia/HCA Healthcare Corp. v. Cottey, 72 S.W.3d 735, 745 (Tex.
App.-Waco 2002, no pet.) ("The proper question as to the element of 'intent' is whether
Cottey proved that, at the time he accepted employment, Appellants intended for Cottey
to act or rely on their partial disclosure about the plan which omitted mention of the
rescission provision."). "Intent is a fact question uniquely within the realm of the trier of fact
because it so depends upon the credibility of the witnesses and the weight to be given to
their testimony." Spoljaric v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986). Intent
may be inferred from a party's actions before and after the fraudulent conduct and may be
proven by the circumstances surrounding the fraud. Id.

 Here, the video speaks for itself. Although the video does advise the patient that
a doctor should explain Remicade's side effects, the video implies that all the side effects
associated with the drug are addressed in the video because some of the side effects are
actually addressed. This is particularly so because in the same discussion in which he
advises viewers to consult their doctors, Dr. Safdi states that "the vast majority of patients,
in our experience, have no problems with the infusion." He further states that "[a]fter the
infusion there are very little side effects that people need to watch for. If they have any
discomfort, we ask them to give us a call. But those reactions, again, are extremely rare. 
And the vast majority of patients really experience no side effects." This implied that
"discomfort" was the only side effect to watch for after the infusion process, which is
demonstrably false given that the package insert warns of several other side effects that
may occur after the infusion. 

 Dr. Bullen testified that the purpose of the video was to show the drug's effect on
people, which was dramatic. In fact, the main thrust of the video was to show how well the
patients felt on Remicade. Throughout the film, the patients are shown walking, running,
carrying their children, and exclaiming how great they feel. Finally, the evidence showed
that the package insert was not included with the video shown and given to Patricia. The
statements regarding the efficacy of the drug is not balanced with any disclosure of the risk
of lupus-like syndrome, or the other risks associated with the drug besides immediate
reactions to the infusion process.

 The evidence of Centocor's marketing strategies shows that this emphasis of the
drug's efficacy and the omission of risk information was intended to induce doctors to
prescribe Remicade and to induce patients to seek treatment with Remicade. As of June
2000, Centocor's marketing strategy included a two-pronged approach that included
educating physicians to "refine their definition of the target Remicade patient" and to teach
patients to "demand Remicade." First, Centocor sales representatives were instructed to
work on making doctors "aggressive" in prescribing Remicade, and Centocor required its
sales associates to sell a specific number of vials of Remicade to doctors' offices. 
Centocor representatives even promoted the idea that doctors could maximize their profits
from prescribing Remicade by providing in-office infusions that would be paid for by
Medicare and Medicaid. 

 Second, Centocor's goal was to make Remicade "top of mind" for every rheumatoid
arthritis patient. A chart admitted into evidence shows Centocor's plan for addressing
patients, and it states that the goal is to "[m]ake the consumer aware the [medical] problem
is treatable" and to "[e]ncourage the patient to request a specific drug." Obviously, the
Centocor video was part of this marketing strategy. (21)

 Furthermore, there was significant testimony about Centocor's attempts to minimize
negative publicity about the dangerous side effects of Remicade. A scientific study
published in the New England Journal of Medicine demonstrated that problems with
Remicade had been understated. Instead of addressing the substantive safety concerns
raised in the article, Centocor's "Communications Program" recognized that the New
England Journal of Medicine "traditionally garners significant media attention," which
includes multiple stories filed by the Associated Press. Centocor's marketing plan states
as its objectives: (1) neutralize the commercial impact of the publication, (2) confine the
story to one news cycle, and (3) provide context to the stories that appear. Furthermore,
Centocor planned to "[d]ecrease/eliminate news value by pre-positioning data as a 'non-story' with key media." Dr. Matthews testified that it would be "highly unusual" for a drug
company to undertake such a program to dilute the effect of a negative peer review article.

 All this evidence indicates an intent by Centocor to induce patients, like Patricia, to
rely on its marketing materials, which omitted significant risk information, and to seek
treatment with Remicade. Centocor does not address any of this testimony, which we hold
is legally and factually sufficient to support a finding of fraudulent intent. Accordingly, we
overrule Centocor's fourth issue. 

VI. Evidence of Future Damages

 The jury awarded Patricia $1 million in damages for physical pain and mental
anguish that, in reasonable probability, Patricia will sustain in the future. By its tenth issue,
Centocor argues that the evidence is legally and factually insufficient to support these
damages. First, Centocor contends that Patricia's lupus-like syndrome was a temporary
side effect that ceased when Patricia stopped taking Remicade, and that there was no
evidence that this symptom would spontaneously reoccur. Centocor argues that there is
no evidence that Patricia will suffer any physical pain in the future related to her Remicade
treatments. Second, Centocor argues that there is no evidence of future mental anguish. 
It notes that Patricia did not testify that she would suffer mental anguish in the future,
except that she feared adverse reactions in the future unrelated to her lupus-like
syndrome. In response, Patricia argues that a plaintiff need not present direct evidence
of the nature, duration, or severity of her mental anguish in order to recover because she
suffered severe pain and disability in the past. We agree with Centocor and reverse the
award of future pain and mental anguish.

A. Applicable Law

 We apply the traditional legal and factual sufficiency standards outlined above in
Part IV.A. To support an award of mental anguish damages, the plaintiff's evidence must
describe "the nature, duration, and severity of their mental anguish, thus establishing a
substantial disruption in the plaintiffs' daily routine." See Fifth Club, Inc. v. Ramirez, 196
S.W.3d 788, 797 (Tex. 2006) (quoting Parkway Co. v. Woodruff, 901 S.W.2d 434, 444
(Tex. 1995)). The Texas Supreme Court has held that "some types of disturbing or
shocking injuries have been found sufficient to support an inference that the injury was
accompanied by mental anguish." Parkway, 901 S.W.2d at 445. For example, as early as
1888, the Texas Supreme Court recognized that serious bodily injury "involving fractures,
dislocations, etc." that result in "protracted disability and confinement to bed" necessarily
result in some degree of physical and mental suffering. See Brown v. Sullivan, 71 Tex.
470, 10 S.W. 288, 290 (1888). To support an award for future mental anguish, a plaintiff
must demonstrate "a reasonable probability" that he or she will "suffer compensable mental
anguish in the future." Adams v. YMCA of San Antonio, 265 S.W.3d 915, 917 (Tex.
2008). 

 In Ramirez, the Texas Supreme Court applied the foregoing rules to an award of
future mental anguish damages. 196 S.W.3d at 797. Ramirez attempted to enter a night
club and engaged in an altercation with a private security guard working at the night club. 
Id. at 790. The security guard slammed Ramirez's head against a wall, knocking him
unconscious, and then struck him several times. Id. Ramirez's skull was fractured as a
result, and he suffered other injuries as well. Id. Ramirez sued the club and claimed future
mental anguish damages. Id. On appeal, the club argued that there was no evidence to
support the award of future damages. Id. at 797-98. The Texas Supreme Court
summarized the evidence on mental anguish as follows:

 Ramirez and his wife testified that Ramirez continued to be depressed,
humiliated, non-communicative, unable to sleep, and angry, continued to
have headaches and nightmares, and that his daily activities and his
relationships with his wife and daughter continued to be detrimentally
affected almost two years after the incident. Ramirez also presented
evidence of the severity of the intentional beating by West, including
significant injuries to his head and body, his loss of consciousness, and his
visits to the hospital. The evidence shows the nature of Ramirez's mental
anguish, its lasting duration, and the severity of his injuries, and is therefore
legally sufficient to support future mental anguish damages.


Id. The court acknowledged that there was no direct evidence that Ramirez would, in
reasonable probability, suffer compensable mental anguish in the future, but it held that
the 

 severe beating received by Ramirez provided an adequate basis for the jury
to reasonably conclude that he would continue to suffer substantial
disruptions in his daily routine of the kind described in his and his wife's
testimony that he had already suffered in the past. The evidence in this case
amounts to far more than worry that medical bills might not get paid . . . or
that someone is disturbed and upset . . . .


Id. at 798.

B. Lupus-like Syndrome

 Patricia does not dispute that after she stopped taking Remicade, her lupus-like
syndrome, and the pain associated with it, went away. There was no testimony presented
at trial that lupus-like syndrome would reappear after discontinuing Remicade therapy. 
Nevertheless, Patricia argues that her pain and temporarily disabling injuries are more than
adequate to support the jury's future damage award. Relying on Ramirez, Patricia argues
that she did not have to present direct evidence that she would, in reasonable probability,
suffer mental anguish in the future because that is no longer required when a plaintiff
suffers personal injuries. We disagree that Ramirez stands for that proposition.

 Although Patricia suffered pain and disability while on Remicade, the pain and
suffering she felt stopped once the Remicade discontinued. Moreover, Patricia did not
present any testimony regarding the mental anguish that she suffered after she stopped
taking Remicade, if any, or that she anticipated mental anguish in the future. Patricia's
injuries certainly support an inference that she suffered physical pain and mental anguish
in the past, and Centocor does not dispute that, but her injuries were not the sort of
"shocking" injuries that would support an inference of future mental anguish. 

 Courts have allowed an inference of future mental anguish in cases involving the
serious injury or death of a family member and mishandling of a corpse. See Parkway,
901 S.W.2d at 445; see also Serv. Corp. Int'l v. Guerra, No. 13-07-00707-CV, 2009 WL
3210940, at *4 (Tex. App.-Corpus Christi Oct. 8, 2009, pet. filed) (mem. op.). In Ibrahim
v. Young, the Eastland Court of Appeals opined that Ramirez does not extend this
inference to every personal injury case claiming future damages, but only to those in which
the injuries are "shocking" or "disturbing." 253 S.W.3d 790, 807 (Tex. App.-Eastland 2008,
pet. denied). In Ibrahim, the plaintiff sued her employer and a furniture manufacturer for
injuries she sustained when her office chair broke and she fell. Id. at 795. She received
an award of future mental anguish damages, but she provided no direct evidence to show
that she would suffer mental anguish damages in the future. Id. at 807. On appeal, she
equated her injuries with those suffered by the plaintiff in Ramirez. Id. at 806. The
Eastland Court of Appeals held that

 Fifth Club does not stand for the proposition that mental anguish damages
can be inferred in all personal injury cases. The court's holding was
premised on the existence of a disturbing or shocking injury. Falling off of an
office chair is not the type of shocking or disturbing injury that we believe the
supreme court had in mind. 


Id. at 807. 

 We agree that Ramirez, and other cases in which future mental anguish can be
presumed, are distinguishable from Patricia's fraud claim. Patricia's injuries were not as
"shocking" or "disturbing" as losing a family member, having a corpse mishandled, or
having a skull cracked by being slammed into a concrete wall. In the absence of any
testimony about mental anguish and physical pain she would suffer in the future, the award
of future damages must be reversed.

C. Liver Injury

 Along with her claims based on lupus-like syndrome, Patricia spent a large amount
of time at trial arguing that Centocor misrepresented the risk of injury to her liver, and it
failed to warn her that Remicade could worsen her pre-existing hepatitis C. Patricia argues
that Remicade altered her DNA in a manner that renders her ineligible to take some
transplant medications in the future, in the event she ever needs a liver transplant. She
did not present any evidence, however, that she actually suffered any injury to her liver as
a result of Remicade, that she would likely need a liver transplant, or that she would, in
reasonable probability, suffer any injury in the future as a result of Remicade. Centocor
argues that under Temple-Inland Forest Products Corp. v. Carter, Patricia cannot base her
award of future pain and suffering or future mental anguish on her "fear" that she might
suffer an adverse event in the future that has not presently manifested. See 993 S.W.2d
88, 93 (Tex. 1999). We agree.

 In Carter, the Texas Supreme Court held that workers who were exposed to
asbestos could not recover damages for their fear of the possibility of developing an
asbestos-related injury in the future. Id. The court explained the policy behind this holding
as follows:

 In almost all instances involving personal injury, the law allows for the
recovery of accompanying mental anguish damages, even if the mental
anguish is not itself physically manifested. But if bodily injury is at most
latent and any eventual consequences uncertain, as when a person's
exposure to asbestos has not produced disease, then the case for recovery
of mental anguish damages is much weaker. A person exposed to asbestos
can certainly develop serious health problems, but he or she also may not. 
The difficulty in predicting whether exposure will cause any disease and if so,
what disease, and the long latency period characteristic of asbestos-related
diseases, make it very difficult for judges and juries to evaluate which
exposure claims are serious and which are not. This difficulty in turn makes
liability unpredictable, with some claims resulting in significant recovery while
virtually indistinguishable claims are denied altogether. Some claimants
would inevitably be overcompensated when, in the course of time, it happens
that they never develop the disease they feared, and others would be
undercompensated when it turns out that they developed a disease more
serious even than they feared. Also, claims for exposure could proliferate
because in our society, as the Supreme Court observed, "contacts, even
extensive contacts, with serious carcinogens are common." Indeed, most
Americans are daily subjected to toxic substances in the air they breathe and
the food they eat. Suits for mental anguish damages caused by exposure
that has not resulted in disease would compete with suits for manifest
diseases for the legal system's limited resources. If recovery were allowed
in the absence of present disease, individuals might feel obliged to bring suit
for such recovery prophylactically, against the possibility of future
consequences from what is now an inchoate risk. This would exacerbate not
only the multiplicity of suits but the unpredictability of results.


Id. For the same reasons, we hold that Patricia's future pain and mental anguish award
cannot be predicated on her fear of developing a liver injury, when she did not present any
evidence of a present injury to her liver. Furthermore, her fear that she may not be able
to take transplant medication is premised on the idea that she will need a transplant in the
future, which she did not prove. Accordingly, we sustain Centocor's tenth issue and
reverse the award of future pain and mental anguish damages.

VII. Thomas's Derivative Claims

 By its eleventh issue, Centocor argues that because Thomas's claims are derivative
of Patricia's claims and Patricia cannot recover, we must reverse the award of loss of
consortium and household services to Thomas. Because we have sustained Patricia's
fraud claim, however, Centocor's argument has no merit. Accordingly, we overrule
Centocor's eleventh issue.

VIII. Punitive Damages

 By its twelfth issue, Centocor argues that the trial court misapplied the punitive
damages cap when calculating the final damages. Specifically, Centocor complains that
the trial court applied the cap to the total damages awarded to the Hamiltons without taking
into account that Centocor was only found 85% liable for the damages. The Hamiltons do
not dispute that the caps apply to the judgment but argue that (1) Centocor waived this
argument because it never raised it in the trial court, and (2) the trial court properly applied
the caps.

 The jury awarded Patricia $1.2 million for past pain and mental anguish, $1 million
for future pain and mental anguish, $1.1 million for past physical impairment, and
$65,908.00 in past medical care expenses. The jury awarded Thomas $50,000.00 for loss
of consortium and household services. The trial court applied the formula set out in section
41.008 of the civil practice and remedies code, which allows recovery of two times the
amount of economic damages plus an amount equal to any non-economic damages found
by the jury, not to exceed $750,000. See Tex. Civ. Prac. & Rem. Code § 41.008 (Vernon
Supp. 2009). (22) The economic damages were $65,908, which was doubled to $131,816. 
Then the trial court added $750,000, for a total award of $881,816.00 in punitive damages
to the Hamiltons. 

 Assuming that Centocor properly preserved this issue, the trial court properly
applied the exemplary damages cap. Exemplary damages are calculated on a per
defendant basis. See Seminole Pipeline Co. v. Broad Leaf Partners, Inc., 979 S.W.2d 730,
751-52 (Tex. App.-Houston [14th Dist.] 1998, no pet.); see also Wackenhut Corp. v. De
la Rosa, No. 13-06-00692-CV, 2009 WL 866791, at *48 (Tex. App.-Corpus Christi Apr. 2,
2009, no pet.). The Fourteenth Court of Appeals in Seminole Pipeline relied on the plain
language of the statute, which, at that time, said that "exemplary damages awarded against
a defendant may not exceed four times the amount of actual damages." 979 S.W.2d at
751. The current version keeps the same language except changes the amount of the
cap. See Tex. Civ. Prac. & Rem. Code § 41.008(b). The court further relied on statements
by the statute's legislative sponsor, who provided the following example of how the cap
should apply, and indicated that the cap applies without reference to the proportion of
liability assigned to a particular defendant:

 The plaintiff's actual damages are $100,000. Plaintiff is 20% responsible for
the loss; defendant A is 30% responsible; and defendant B is 50%
responsible. The jury imposes punitive damages against defendant A in the
amount of $250,000 and against defendant B in the amount of $1,000,000.
According to Senator Montford, the plaintiff is entitled to collect punitive
damages of $650,000, namely, $250,000 from defendant A and $400,000
(4 x $100,000) from defendant B.


Seminole Pipeline, 979 S.W.2d at 751 n.21. Accordingly, we hold that the trial court
properly applied the punitive damages cap, and we overrule Centocor's twelfth issue. 

IX. Conclusion (23)

 We have overruled Centocor's challenges to the judgment on the Hamiltons' fraud
claim, except that we have sustained Centocor's challenge to the $1 million future
damages award. We modify the judgment against Centocor to delete the award of $1
million in future pain and mental anguish damages, and we affirm the judgment as
modified.

 


 

 Linda R. Yañez Justice




Delivered and filed 

the 4th day of March, 2010.

1. The Hamiltons filed a conditional cross-appeal arguing that if the "learned intermediary" doctrine
applies to non-prescribing doctors, then this Court should grant a new trial for Hamilton's claims against
Michael Bullen, M.D. Because we recognize an exception to the "learned intermediary" doctrine in this case,
we do not reach this conditional cross-issue. See Tex. R. App. P. 47.1.
2. During the trial, the witnesses referred to "lupus-like syndrome" and "drug-induced lupus"
interchangeably. 
3. Leukopenia means a "[l]ower than the normal amount of white blood cells." See MedicineNet.com,
Definition of Leukopenia, http://www.medterms.com/script/main/art.asp?articlekey=4149 (last visited Feb. 11,
2010).
4. Pericarditis is defined as "[i]nflammation of the lining around the heart (the pericardium) causing
chest pain and accumulation of fluid around the heart (pericardial effusion)." See MedicineNet.com, Definition
of Pericarditis, http://www.medterms.com/script/main/art.asp?articlekey=4833 (last visited Feb. 11, 2010). 
5. Sarcoidosis is defined as 


 [a] disease of unknown origin that causes small lumps (granulomas) due to chronic
inflammation to develop in a great range of body tissues. Sarcoidosis can appear in almost
any body organ, but most often starts in the lungs or lymph nodes. It also affects the eyes,
liver and skin; and less often the spleen, bones, joints, skeletal muscles, heart and central
nervous system (brain and spinal cord). In the majority of cases, the granulomas clear up
with or without treatment. In cases where the granulomas do not heal and disappear, the
tissues tend to remain inflamed and become scarred (fibrotic).


See MedicineNet.com, Definition of Sarcoidosis, MedicineNet.com,
http://www.medterms.com/script/main/art.asp?articlekey=13430 (last visited Feb. 11, 2010). 
6. According to the testimony at trial, rheumatology is a field of internal medicine specializing in treating,
among other things, joint pain, inflammation, and auto-immune diseases, including lupus and sarcoidosis. 
7. Dr. Hauptman's records indicate that at the time Patricia first came to his office, she was taking
Celebrex. Michael Guirl, M.D., testified that Celebrex is an anti-inflammatory medication that is used to treat
a variety of conditions, including arthritis.
8. Testimony at trial established that an infusion involves placing a catheter into the patient's arm with
intravenous tubing and infusing the medication directly into the patient's vein. 
9. Pleurisy is defined as "[i]nflammation of the pleura, the linings surrounding the lungs." See
MedicineNet.com, Definition of Pleurisy, http://www.medterms.com/script/main/art.asp?articlekey=4948 (last
visited Feb. 11, 2010).
10. "Sarcoidosis" is scratched through on the document with an ink pen. We are unable to tell from the
record who scratched through the word.
11. We note that although Hamilton filed suit against Centocor on March 19, 2003, she continued to
take infusions of Remicade through September 2, 2003. 
12. The Hamiltons also alleged causes of action for negligence, gross negligence, and
misrepresentation. 
13. The jury also found Centocor liable for negligent misbranding, negligent marketing to Patricia's
doctors, misrepresentation to Patricia's doctors, and negligent undertaking. Because we affirm the judgment
on the basis of the fraud finding, we do not address the other causes of action found by the jury.
14. Dr. Pop-Moody settled with the Hamiltons for $50,000, and Dr. Hauptman settled for a confidential
amount. 
15. In two prior cases, the Texas Supreme Court held that a drug manufacturer could be liable for
injuries where it misrepresented to or failed to properly warn physicians of a risk associated with a drug. See
Bristol-Myers Co. v. Gonzales, 561 S.W.2d 801, 804 (Tex. 1978); Crocker v. Winthrop Labs., Div. of Sterling
Drug, Inc., 514 S.W.2d 429, 433 (Tex. 1974). Those cases, however, did not expressly state or apply what
later became known as the "learned intermediary" doctrine, which, as we explained in Gravis, allows a drug
manufacturer to satisfy its duty to warn the ultimate consumer by warning physicians. See Gravis v.
Parke-Davis & Co., 502 S.W.2d 863, 870 (Tex. Civ. App.-Corpus Christi 1973, writ ref'd n.r.e.).
16. In 1986, however, the National Childhood Vaccination Act was passed, which rejected the "mass
immunization" exception to the learned intermediary doctrine with respect to manufacturers of childhood
vaccines because of the "supposed risk to manufacturers." Patrick Cohoon, An Answer to the Question of
Why the Time Has Come to Abrogate the Learned Intermediary Rule in the Case of Direct-to-Consumer
Advertising of Prescription Drugs, 42 S. Tex. L. Rev. 1333, 1338 (2001) (citing 42 U.S.C. § 300aa-22(c)); see
also In re Swine Flu Immunization Program, 533 F. Supp. 703, 717 (D. Utah 1982) (discussing the Swine Flu
Act and that it resulted because drug manufacturers refused to sell swine-flu vaccinations unless the
government provided liability protection).
17. Effective September 1, 2003, the Texas Legislature adopted section 82.007 of the Texas Civil
Practice and Remedies Code, which created a rebuttable presumption that a warning accompanying a
prescription drug "in its distribution" is adequate if it is approved by the FDA. Tex. Civ. Prac. & Rem. Code
Ann. § 82.007 (Vernon 2005). This statute became effective after this suit was filed and is not retroactive in
its application; thus, it has no application to this case. Act of June 11, 2003, 78th Leg., R.S., ch. 204, § 23.02,
2003 Tex. Sess. Law Serv. 898-99 (2003). Moreover, it is not clear that this statute was intended to cover
something other than a package insert, which accompanies a prescription drug "in its distribution," and there
was no evidence presented at trial that the video shown to Patricia was ever approved by the FDA.
18. As a corollary, Centocor argues as part of its first issue that because Patricia's doctors knew about
the risk of lupus-like syndrome, the doctor's knowledge negates causation in a warning defect claim. That
is true in cases where the duty to warn can be satisfied by adequately warning a learned intermediary. See
Stewart v. Janssen Pharmaceutica, Inc., 780 S.W.2d 910, 912 (Tex. App.-El Paso 1989, writ denied). 
However, we hold today that Centocor cannot rely on its adequate warnings to Patricia's physicians when it
directly misrepresented its product's dangerous propensities to Patricia. In other words, it is Patricia's
knowledge that is relevant, not her doctors' knowledge. Likewise, within its second issue, Centocor argues
that there was no expert testimony establishing that a different warning would have changed Patricia's doctors'
decision to prescribe Remicade. Because we have held that Centocor cannot rely on its warnings to her
physicians to shield it from liability in this case, we overrule those issues. 
19. Centocor argues in one sentence in this issue that the jury did not have the opportunity to determine
if Remicade was defective because the trial court refused Centocor's proposed "marketing defect" instruction
with respect to Centocor's negligence claim. Centocor, however, does not brief this as an issue and did not
ask for this instruction with respect to the fraud claim, which is the cause of action on which the judgment is
based. See Tex. R. App. P. 38.1(i).
20. Within its fourth issue, Centocor also makes several arguments regarding the learned intermediary
doctrine and causation, which we have already addressed.
21. The Hamiltons argue that an e-mail from Centocor's director of Immunology Marketing shows that
Centocor's sales force "begged" to remove "fair balance" information from the "patient success story" videos
because "patients were getting frightened." However, this e-mail was never admitted into evidence at trial;
rather, it appears in the record as an attachment to the Hamiltons' response to Centocor's motion for new trial. 
As damaging as this e-mail is, we cannot consider it because it was not made part of the record at trial. See
Maximum Med. Improvement, Inc. v. County of Dallas, 272 S.W.3d 832, 834 n.3 (Tex. App.-Dallas 2008, no
pet.).
22. The prior, 2001 version of this statute applies to the Hamiltons' claims. We note, however, that the
statutory amendments since 2001 have not altered the damage cap amounts. Compare Act of May 21, 2001,
77th Leg., R.S., ch. 643, § 3, 2001 Tex. Sess. Law. Serv. 1136, 1137 (Vernon 2001); with Act of June 2, 2003,
78th Leg., R.S., ch. 204, § 13.06, 2003 Tex. Sess. Law. Serv. 847, 888 (Vernon 2003); with Act of May 17,
2007, 80th Leg., R.S., ch. 593, § 3.03, 2007 Tex. Sess. Law. Serv. 1122, 1132 (Vernon 2007). 
23. In its remaining issues, Centocor challenges the alternative bases for the judgment. Specifically,
by its fifth issue, Centocor argues that the judgment should be reversed because Patricia's claims for implied
misrepresentation under section 402B of the Restatement (Second) of Torts, as stated in Questions 3 and
4 of the jury charge, cannot be maintained because section 402B only applies to express misrepresentations. 
By its sixth issue, it argues that those claims fail on the evidence. Centocor argues in its seventh issue that
the Hamiltons' negligence claims should be reversed because Patricia failed to present expert testimony on
the standard of care and breach of that standard. By its eighth issue, Centocor argues that negligent
misbranding is not recognized as a cause of action in Texas. Centocor's ninth issue argues that the
distribution of a videotape does not constitute a negligent undertaking as a matter of law. Because we have
sustained the verdict on Patricia's fraud claim, we need not address these issues. See Tex. R. App. P. 47.1.